**Opinion issued October 12, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00297-CV

_____

## IN THE INTEREST OF N.L.S. AND E.J.C. A/K/A E.J.C., CHILDREN

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 114085-F**

---

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's order, entered after a bench trial, terminating her parental rights to her minor children, N.L.S. and E.J.C., also known as E.J.C. (collectively, the "children"), and awarding appellee, the Department of Family and Protective Services ("DFPS"),

---

[1] *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

sole managing conservatorship of the children.  Appellant, father, challenges the trial court's order, entered after a bench trial, terminating his parental rights to his minor child, N.L.S.[2]  In three issues, mother contends that the trial court erred in appointing DFPS as the sole managing conservator of the children and the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being,[3] she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being,[4] she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children,[5] and termination of her parental rights was in the best interest of the children.[6]  In two issues, father contends that the evidence is legally and factually insufficient to support the trial court's findings that father engaged, or knowingly placed N.L.S. with persons who engaged, in conduct that

[2]     N.L.S. was seven-years old and E.C.J. was one-year old at the time the trial court signed its order terminating mother's and father's parental rights.  The trial court also terminated the parental rights of E.C.J.'s father, but he is not a party to this appeal.

[3]     *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

[4]     *See id.* § 161.001(b)(1)(E).

[5]     *See id.* § 161.001(b)(1)(O).

[6]     *See id.* § 161.001(b)(2).

2

endangered his physical or emotional well-being[7] and termination of his parental rights was in the best interest of N.L.S.[8]

We affirm in part and reverse and render in part.

## Background

On January 6, 2023, DFPS filed a second amended petition seeking termination of mother's parental rights to the children, termination of father's parental rights to N.L.S., and managing conservatorship of the children.[9]

### *Officer Bilbrey*

At trial, Holiday Lakes Police Department ("HLPD") Officer P. Bilbrey testified that, while engaging in a welfare check on August 16, 2021, she went to a trailer home located in Holiday Lakes, Texas at about 5:20 p.m. Bilbrey did not see any cars in the driveway of the home. When Bilbrey knocked on the front door,

---

[7] *See id.* § 161.001(b)(1)(E).

[8] *See id.* § 161.001(b)(2). Although in his prayer in his appellant's brief, father requests "reversal of the trial court's appointment of . . . DFPS [as] permanent managing conservator[]" of N.L.S., father has not challenged or raised an issue in his briefing related to the portion of the trial court's order awarding DFPS sole managing conservatorship of N.L.S. *See* TEX. R. APP. P. 38.1(f) (requiring appellant's brief to concisely state *all* issues presented for review), 38.1(i) (brief must contain clear and concise argument for contentions made, with appropriate citations to authorities and to record); *Jacobs v. Satterwhite*, 65 S.W.3d 653, 655–56 (Tex. 2001) (failure to raise issue on appeal waives error). Thus, to the extent that father seeks to challenge the trial court's appointment of DFPS as the sole managing conservator of N.L.S., we hold that the issue is waived due to inadequate briefing.

[9] DFPS also sought termination of the parental rights of E.J.C.'s father.

N.L.S. answered.[10]  Bilbrey asked N.L.S. if mother was home, and N.L.S. told her that he was "home alone," "mother [was] not [t]here," and he had her cellular telephone.  (Internal quotations omitted.)  When Bilbrey asked N.L.S. if he knew where mother had gone, he said "[n]o."  (Internal quotations omitted.)  Because N.L.S.'s answers to her questions were concerning, Bilbrey entered the home and yelled, "Holiday Lakes Police Department."  (Internal quotations omitted.)  No one responded.  Bilbrey then shouted several more times.  She also banged on the bedroom door in the home, which was locked, and yelled, "Holiday Lakes Police Department.  Is anybody home?"  (Internal quotations omitted.)  No one responded.  Bilbrey estimated that she was inside the home for about five to ten minutes knocking on doors and yelling, but she never received a reply.

According to Officer Bilbrey, she stayed at the trailer home with N.L.S. for about fifteen to thirty minutes.  While there, she had concerns about the condition of the home.  Ultimately, around 5:45 p.m. Bilbrey and N.L.S. left the home together, and she brought him to the HLPD station with her.  During the entire time that Bilbrey was at N.L.S.'s home on August 16, 2021, no adult was present with N.L.S.

Officer Bilbrey explained that the HLPD station was about three blocks away from the trailer home where she found N.L.S.  Neither mother nor father came looking for N.L.S. while he was at the HLPD station.  At about 7:00 p.m., another

---

[10]    N.L.S. was five-years old at the time.

law enforcement officer went back to the trailer home. Law enforcement officers finally found mother around 7:45 p.m., and mother came to the HLPD station around 8:00 p.m. Around 10:00 p.m., Bilbrey went back to the trailer home to pick up E.J.C., who was an infant.[11] Another adult, "Frankie," was at the home with E.J.C., and she put together a bag for E.J.C. Both Frankie and Bilbrey looked around the home for formula for E.J.C., but they could only find enough formula in the home to make one two-ounce bottle. Although Frankie gave Bilbrey a car seat for E.J.C., it was "[d]irty." Frankie did not give Bilbrey any clothes that fit E.J.C. Frankie told Bilbrey that she had been gone from the home all day.

Officer Bilbrey further testified that when she spoke to mother at the HLPD station, mother told her that she had been sleeping in the bedroom when Bilbrey first came to the trailer home around 5:20 p.m. But, at trial, Bilbrey explained that when she was at the trailer home on August 16, 2021, she had tried to open the door to the bedroom, and the door was locked. Bilbrey noted that she did a "cop knock" on the bedroom door loudly, and she did not hear a response from anyone on the other side of the bedroom door, where mother was purportedly sleeping.

### *Officer Newberry*

Former HLPD Officer M. Newberry testified that on August 16, 2021, she performed a welfare check, along with her then-partner, Officer Bilbrey, at a trailer

---

[11]    E.J.C. was two-months old at the time.

home located in Holiday Lakes. Upon arrival at the trailer home around 5:20 p.m., Bilbrey knocked on the front door, and N.L.S. answered. The officers asked N.L.S. if he was home alone, and he said "yes" and that "nobody was home." (Internal quotations omitted.) Bilbrey then entered the home to determine whether any other person was present. Bilbrey knocked loudly and yelled loudly while inside the trailer home. In Newberry's opinion, if someone was home, she "would have known [that Bilbrey] was in the house." Bilbrey tried to open the bedroom door in the trailer home but could not do so because it was locked. Bilbrey did not find anyone else in the home other than N.L.S. Newberry then made a call to DFPS. DFPS told the law enforcement officers to bring N.L.S. back to the HLPD station with them, which they did. Newberry estimated that she and Bilbrey were at the trailer home for about thirty to forty-five minutes with N.L.S. before they took N.L.S. to the HLPD station. After Newberry dropped Bilbrey and N.L.S. off at the HLPD station, she went to buy food for N.L.S. and brought it back to him.

Officer Newberry further testified that at some point while N.L.S. was at the HLPD station, DFPS investigator Heather Mendoza arrived. And at about 7:00 p.m., Newberry went back to the trailer home to see if anyone was there. At the trailer home, Newberry pounded on the door and yelled, but no one answered. There were no cars in the driveway.

6

At 7:24 p.m., law enforcement officers received a message from a neighbor stating that there was a car in the trailer home's driveway, and Officer Newberry returned to the trailer home at about 7:36 p.m., along with Officer Bilbrey. Newberry knocked on the front door of the home, and a woman, "Frankie," answered. Newberry identified herself and said that she was looking for mother. Frankie indicated that mother was inside the home. Bilbrey then spoke with mother and asked mother if she knew where N.L.S. was. Mother responded that N.L.S. was "out playing at a friend's house," and then Bilbrey told mother that N.L.S. was at the HLPD station. Mother indicated to Bilbrey that the last time she had seen N.L.S. was "a few hours" before the officers' arrival. The officers then requested that mother come to the HLPD station, which was a few blocks away from the trailer home.

According to Officer Newberry, she and Officer Bilbrey arrived back at the HLPD station at about 7:45 p.m., but mother did not show up. Thus, at about 8:00 p.m., Newberry went back to the trailer home to find mother. Newberry found mother "fiddling with something on the front porch, [and] kind of going in and out" of the home. Mother and Frankie were talking. Newberry told mother that "she needed to come now," and she did not leave the home until mother followed her back to the HLPD station.

*HLPD Incident Report*

The trial court admitted into evidence a copy of a HLPD incident report related to the events on August 16, 2021. It lists mother as the "[s]uspect/[o]ffender" and the offense as abandoning or endangering a child.[12]

Officer Newberry states in the "[n]arrative[]" portion of the incident report that she and Officer Bilbrey received a telephone call from a Holiday Lakes resident about a five-year old child, N.L.S., who had been at the resident's home for the past few days. N.L.S. had been spending all day at her home with "no parent coming by to check on him." The resident reported that N.L.S. had arrived at her home each day dirty, hungry, with no shoes, and in the same clothes. On August 16, 2021, N.L.S. showed up at the resident's home at about 8:00 a.m., with a fish tank and some other belongings in his hands. He asked the resident if he could move in with her because "his mom [had] kicked him out of [h]is home." N.L.S., "with tears in his eyes," told the resident that he had been kicked out of his home "because he was trying to fill his fish tank up." When the resident had to leave her home later that day, she told N.L.S. that he needed to go home until she returned. But when she drove by N.L.S.'s home, she saw N.L.S. sitting on the front porch of his home holding his fish tank. The resident decided to report the incident to the HLPD.

---

[12]    *See* TEX. PENAL CODE ANN. § 22.041.

According to Officer Newberry, she and Officer Bilbrey told the resident that they would go by N.L.S.'s home and perform a welfare check and see who else was at the home. Newberry and Bilbrey arrived at N.L.S.'s home, located in Holiday Lakes, at about 5:20 p.m. Newberry noticed "a lot of garbage and shoes and many more random objects all over the front yard and porch area of the home." And when Newberry and Bilbrey went to the front door of the home, "there was a very strong smell of ammonia," which concerned the officers. Although the screen door to the home was closed, the main front door to the home was open. Bilbrey knocked on the door, and N.L.S. came and opened the screen door for the officers. When the officers asked N.L.S. if anyone was home with him, he replied, "No, my mom is not home right now, but I have her cell[ular] [tele]phone." (Internal quotations omitted.) Newberry and Bilbrey then yelled into the home, "Holiday Lakes Police Department, is anyone in the home?" (Internal quotations omitted.) And N.L.S. kept repeating that "no one was [t]here." After Bilbrey entered the home, she "looked in the rooms to confirm that no one was there."

Officer Newberry further explained that the bedroom door in the home was locked, so Officer Bilbrey knocked on the door and yelled, "Holiday Lakes Police is anyone home?" But no one responded. Bilbrey and N.L.S. sat on the front porch of the home, while Newberry stepped away to call DFPS. Newberry was instructed to bring N.L.S to the HLPD station with the officers. At about 5:44 p.m., Newberry

9

and Bilbrey left the home with N.L.S. and brought N.L.S. to the HLPD station, where they arrived at 5:47 p.m. Newberry left Bilbrey and N.L.S. at the station and went to pick up food for N.L.S. because he stated that he was hungry and that he had not eaten anything that day. Newberry returned to the HLPD station with food, and a DFPS investigator Mendoza arrived at the station at about 6:30 p.m.

The narrative portion of the incident report further notes that at about 7:00 p.m., Officer Newberry returned to N.L.S.'s home "to see if anyone showed up looking for him," but no one was there. Newberry then went back to the HLPD station, and at 7:24 p.m., law enforcement officers "received a message that a gray [car had been] seen in the driveway of [the] home." This prompted Newberry and Officer Bilbrey to return to the home, and when they did, they saw a gray car parked in the driveway. The officers approached the home and knocked on the front door. A woman, who identified herself as "Frankie," answered the door, and the officers asked Frankie if mother was home. Frankie got mother out of a room in the home and told her that "the cops [were] [t]here for [her]." Mother then came out to the front porch holding an infant in her arms. Newberry asked mother if she knew where N.L.S. was, and mother responded that he was "[d]own the road at a friend's house." (Internal quotations omitted.) Newberry asked mother when she last saw N.L.S., and she stated that she had seen him that morning, but she was not sure of the exact time. Mother also told Newberry that she had been at the home all day. Newberry

then told mother that N.L.S. was at the HLPD station, he was speaking to a "social worker," and mother needed to come to the station. Mother replied that she would meet the law enforcement officers at the station.

According to Officer Newberry, she and Officer Bilbrey arrived back at the HLPD station at about 7:45 p.m. They told the DFPS worker that mother was on her way to the station. When mother had not arrived at HPLD station by 8:00 p.m., Newberry went back to N.L.S.'s home and found mother outside. Newberry told mother that she needed to come to the HLPD station right then and that Newberry would follow her to the station to make sure that mother "got there ok." When mother arrived at the HLPD station, she spoke with DFPS investigator Mendoza. After Mendoza spoke with mother, she informed Newberry and Bilbrey that mother's infant would need to be removed from the home. At about 9:56 p.m., Bilbrey arrived at N.L.S.'s home to pick up E.J.C., who was two-months old at the time. At about 11:05 p.m., Mendoza took the children "into legal [DFPS] custody."

Attached to the HLPD incident report is a voluntary statement from the Holiday Lakes resident who contacted law enforcement officers about N.L.S. on August 16, 2021. In her voluntary statement, the resident states that N.L.S. was five-years old and had been at her home "all day" for the past four days. She was concerned about N.L.S. because he had been at her house "so often [and] for so long [and] . . . mother never came around." The resident had "never met" mother.

11

Further, on August 16, 2021, N.L.S. came to the resident's home at 8:00 a.m. and asked her "if he could live with [her] because . . . mother [had] kicked him out because he was filling up his fish tank."[13]  N.L.S. "got teary eyed," and the resident let him into her house and fed him.  At about 2:00 p.m., the resident told N.L.S. "to go home," but he came back less than fifteen minutes later and said that mother had "kicked him out again."  Later, when the resident had to leave her home, she asked N.L.S. if she could "drop[] him off at home" and he told her that "he was going to get a spanking from" mother.  When the resident drove by N.L.S.'s home at about 5:00 p.m., she saw him sitting on the front porch.  The resident noted that on August 16, 2021, N.L.S. was wearing shoes, but on the other days that he was at her home, he showed up barefoot, hungry, and wearing the same clothes.

### DFPS Investigator Mendoza

Heather Mendoza, a former DFPS investigator, testified that she went to the HLPD station on August 16, 2021 in response to a call involving allegations of negligent supervision of N.L.S.  According to Mendoza, one of mother's neighbors had called law enforcement officers because she believed that N.L.S. was home

---

[13]    Mother, during her testimony, acknowledged that N.L.S. had a fish tank but stated that he did not have a fish in the tank.  Further, according to mother, she sent N.L.S. down to the neighbor's home on the morning of August 16, 2021 so that he could get his shoes, which he had left there.  Mother denied kicking N.L.S. out of the house.

alone. Law enforcement officers then went out to N.L.S.'s home and did not find any adults in the home with N.L.S.

Mendoza explained that she arrived at the HLPD station around 6:00 p.m. or 6:30 p.m. and she spoke to N.L.S. According to Mendoza, she was at the HLPD station for several hours before mother arrived. When Mendoza eventually spoke to mother at the HLPD station, she expressed DFPS's concern that N.L.S. "had been left unattended for several hours" when he was only five-years old. Mendoza told mother that it appeared that mother was not able to provide adequate supervision for N.L.S. Mother reported to Mendoza that she had been living in her home in Holiday Lakes for only a few weeks.

Mother also told Mendoza that she had woken up early on the morning of August 16, 2021 with E.J.C. Between 12:00 p.m. and 2:00 p.m., N.L.S. went "to go play with some friends." Mother laid down to take a nap with E.J.C. sometime between 12:00 p.m. and 2:00 p.m., and she stayed asleep until law enforcement officers found her after 7:00 p.m. According to mother, she was at home asleep when law enforcement officers came by around 5:00 p.m. on August 16, 2021. Mother stated that "Frankie" "had been in the home," but "she had [gone] to town to pay a bill."

As to E.J.C., Mendoza noted that the child was "very thin" and had "a severe diaper rash." Mother told Mendoza that she had "purchased ointment to be us[ed]" for the diaper rash.

According to Mendoza, DFPS was concerned about possible narcotics-use by mother, and mother participated in narcotics-use testing on August 20, 2021, shortly after the children were removed from her care. Mother disclosed to Mendoza that she had used methamphetamines in the past. But mother stated that she had stopped using narcotics "cold turkey."

Mendoza also testified that N.L.S. and E.J.C. were ultimately removed from mother's care on August 16, 2021 because they were "both of a vulnerable age" and were "not able to self-protect or even understand if they were in harm's way." And DFPS "believed [that mother] lacked the ability to supervise [the] children properly at th[e] time." Mother reported to Mendoza that father was incarcerated, but she did not know where. Mother confirmed that father was in fact N.L.S.'s biological father.

### DFPS Caseworker West

DFPS caseworker Trisha West testified that the children were placed together in the same foster home, but the foster home was not an adoptive home. The children appeared to be bonded to one another. West described N.L.S. as having "a lot of energy" and personality.

14

As to mother, West stated that she had created a Family Service Plan ("FSP") for mother in September 2021, after the children were removed from mother's care. Mother's FSP instructed her to complete the requirements of her FSP by August 31, 2022. According to West, mother's FSP required her to participate in individual therapy and random narcotics-use testing. Mother was also required to attend all court hearings and permanency planning meetings as well as supervised weekly visitation with the children. And she was required to remain "drug and alcohol free" and complete a psychological evaluation and follow any recommendations from the evaluation. Mother was also supposed to participate in substance-abuse counseling, complete a "drug and alcohol assessment," and maintain a safe and stable home.

West explained that mother completed her psychological evaluation and a "drug and alcohol assessment" in September 2021. Mother attended thirteen out of the fifteen required substance-abuse-counseling sessions, but mother stopped attending substance-abuse counseling in July 2022 about six months before trial.[14] Mother failed to complete her substance-abuse counseling, and she did not give West a certificate of compliance showing that she had successfully completed substance-abuse counseling. West further testified that mother attended some individual therapy sessions—about nine—but she stopped attending individual

---

[14]     Trial in this case took place in February 2023.

15

therapy in September 2022. Mother did not give West a certificate of completion showing that she had successfully completed individual therapy.

As to narcotics-use testing, West testified that mother was required to participate in random narcotics-use testing whenever it was requested by DFPS. Usually, DFPS asked mother to submit to narcotics-use testing twice a month, but mother rarely participated. According to West, mother submitted to one narcotics-use test during the entire pendency of the case. Mother would sometimes tell West that she was going to go get tested but would then fail to do so. Mother had been asked to submit to twenty-four narcotics-use tests during the pendency of the case.[15]

As to mother living situation, West testified that when the children entered DFPS's care, mother was living in a trailer home with "Frankie." Then, after the children were removed from mother's care, mother and E.J.C.'s father[16] moved into

---

[15] West stated that, during the pendency of the case, mother told West that she had been submitting to the required narcotics-use tests but "they had her name and information wrong in the system," which was why West "could not pull [anything] up" showing that mother had been submitted to testing. To fix that situation, West, over the course of several months, tried to meet mother at a narcotics-use testing facility to "rectify th[e] situation." West was finally able to meet mother at a narcotics-use testing facility in July 2022, and "[t]he facility [told West] that [mother's] information was correct in the system, and they confirmed that she had not been [tested] since August . . . 2021."

[16] West testified that E.J.C.'s father was given an FSP, which required him to, among other things, maintain a safe and stable home, participate in random narcotics-use testing, complete a psychological evaluation, and attend all supervised visitation with E.J.C. and all court hearings and permanency planning meetings. E.J.C.'s father did not maintain safe and stable home throughout the pendency of the case or

a home together. After that, mother "went to jail," and once she was released, mother "mov[ed] from friend to friend."[17] Then, mother began living with E.J.C.'s father and his mother. But, at the time of trial, mother was living in a one-bedroom apartment with E.J.C.'s father. West stated that she had made attempts to visit mother in her various homes throughout the pendency of the case, but she had not been able to do so. As to mother's most recent home, West stated that she had "made a couple of appointments" with mother to see the apartment that mother was living in with E.J.C.'s father, but the appointments "fell through."

West further stated that mother had attended most of her weekly supervised visits with the children, and she had been "mostly compliant" with that requirement of her FSP. Mother brought food and toys to the visits, and she sometimes brought clothing. Mother engaged with the children at her visits; she played with them and did not act inappropriately. Mother did not attend visits with the children while she was "in jail." West acknowledged that the children "adore[d]" mother.

According to West, mother had also attended court hearings and participated in "group conference meetings" with DFPS, as required by her FSP. Although mother provided West with the name of one potential placement for the children,

---

submit to any narcotics-use testing. E.J.C.'s father failed to complete most, if not all, of the requirements of his FSP. West also noted that E.J.C.'s father was arrested during the pendency of the case on "a theft charge."

[17]     According to West, mother told her that "she was living from place to place with friends."

West left "multiple messages for" the placement, but she "never heard back." West asked mother at least seven or eight times for the name of a potential placement for the children.

West also testified that mother was arrested during the pendency of the case and was in "jail" from April 29, 2022 until June 4, 2022. At the time of trial, mother was "on probation."

As to mother's employment, West explained that mother told her that she "worked cleaning beach houses," but she was "paid cash." Mother never provided West any documentation to show that she was employed.

As to why West believed that termination of mother's parental rights to the children was appropriate, West testified that she was concerned about mother's ability to provide a safe and stable home for the children and about mother's narcotics use. West also expressed concern that mother had not completed the requirements of her FSP, and it appeared that she was living with E.J.C.'s father. Mother's living arrangement with E.J.C.'s father concerned West because he had not completed the requirements of his FSP and he had not participated in any narcotics-use testing, so DFPS had no way of knowing whether E.J.C.'s father was sober.

As to father, West testified that she created a FSP for father in September 2021, but it did not contain any requirements for father to complete. According to

18

West, at the time N.L.S. entered DFPS's care, father was incarcerated, and he had remained incarcerated during the pendency of the case. Father was set to be released from confinement in 2025. West visited father while he was incarcerated, and he gave her the names of his sister and his girlfriend as potential placements for N.L.S., but he did not have contact information for either of them. According to West, father was not a suitable placement for N.L.S. at the time of trial because he was incarcerated.

West also testified that when she visited father while he was incarcerated, he told her that mother was "not a good mother" and "she was never home." And in the past, when they briefly lived together for two months in 2018, father had been "the one taking care of" N.L.S.

### *Dr. Stadler*

Dr. Jenny Stadler, a clinical psychologist who conducted mother's psychological evaluation, testified that she met with mother on October 9, 2021 for about three hours. Mother told Dr. Stadler that N.L.S. had been taken from her home by law enforcement while she was asleep in the home with E.J.C., who was about two-months old at the time. Mother indicated that she was exhausted because she had been awake the night before with E.J.C. According to mother, she laid down about 4:30 p.m. or 5:00 p.m., and she was asleep in the bedroom of the home when law enforcement officers performed the welfare check. Mother responded that

19

N.L.S. "had been spending time with the neighborhood children" on the day that law enforcement officers came to her home. Mother and the children had only been living in the neighborhood for about a week before the incident on August 16, 2021.

Mother also told Dr. Stadler that she had taken a narcotics-use test and had "failed it for meth, methamphetamines, and methadone." Additionally, mother referenced a text message she had sent "about selling drugs" because "she was confused" and "didn't think that offering to sell [m]ethadone was illegal." Mother told Dr. Stadler that in the past she had used marijuana, methamphetamine, cocaine, alcohol, and ecstasy. According to mother, she began using marijuana and methamphetamines when she was twelve years old. She started drinking alcohol at fourteen or fifteen years old, and she used "acid once in [ninth] grade." Mother used opioids when she was about twenty-five or twenty-six years old. Mother denied using "[a]ny substances" at the time of her meeting with Dr. Stadler.

When Dr. Stadler asked mother whether she had ever been involved in a physical altercation, mother said that she had been involved in physical altercations as a kid and as an adult. The last physical altercation mother had was with the girlfriend or ex-girlfriend of E.J.C.'s father. Mother did not tell Dr. Stadler when the physical altercation took place. Mother also indicated that she was involved in another physical alteration in 2014.

20

*Mother*

Mother testified that N.L.S. and E.J.C. were her children. Mother explained that on August 16, 2021, the date the children were removed from her care, mother was in the bedroom in her trailer home asleep with E.J.C., who was two-months old at the time. According to mother, she and E.J.C. went to sleep about 4:30 p.m. And when law enforcement officers knocked on the door of the home on August 16, 2021, she did not hear them because she was in the bedroom with the door shut. Mother stated that she had been "up all night" with the children and she was exhausted. According to mother, the door to her bedroom was not locked. Mother woke up about 7:00 p.m. or 7:30 p.m., when "Frankie" told her that law enforcement officers wanted to speak with her.

When mother spoke to law enforcement officers on August 16, 2021, she told them that N.L.S. was playing at a neighbor's house because she assumed that was where he was because he was not in the house. At trial, mother acknowledged that she had not met the parents of the children N.L.S. had been playing with in the neighborhood, and she would not watch N.L.S. when he went to go play with other kids. However, according to mother, N.L.S. was not allowed to go outside of the trailer home without telling mother, and he had to stay in the yard unless he asked to leave. Yet mother agreed that it was possible for N.L.S. to leave the trailer house

21

on his own. Mother stated that she did not kick N.L.S. out of the house on August 16, 2021.

As to her housing at the time of trial, mother explained that she lived in a one-bedroom apartment at the Cranbrook Apartment complex with E.J.C.'s father. She had been living there since July 7, 2022. According to mother, E.J.C.'s father went "back and forth between" her apartment and the apartment that his mother was living in, which was in the same apartment complex. Mother further testified that the mother of E.J.C.'s father was being evicted from her apartment, so E.J.C.'s father would then stay with mother. However, she noted that E.J.C.'s father "said that if it was a problem [for] him being in [mother's home] due to the case," then "he would go elsewhere." Mother stated that there was "no lease" for her apartment, and E.J.C.'s father "d[id] the maintenance" for the apartment complex. Because E.J.C.'s father "d[id] the maintenance," mother did not have to pay rent for the apartment, but she was responsible for paying for electricity. According to mother, she was not in a relationship with E.J.C.'s father, but she did not feel that he was a danger to the children. Mother last saw E.J.C.'s father about two weeks before trial.

Mother acknowledged that, during the pendency of the case, she had four different residences. After the children were removed from her care, mother continued living at the trailer home in Holiday Lakes for about a month. Mother stated that the trailer home had a porch, a living room, a kitchen, a bedroom, and a

bathroom.  Mother did not own the trailer home but was renting it.  According to mother, she had food and clothes in the home for the children as well as diapers for E.J.C.

Mother next moved into a friend's home until July 7, 2022.  She did not have a lease at that time, but she paid rent.  Mother then moved to the Cranbrook Apartment complex after that.  She had lived in two different apartments in that complex since July 7, 2022.  Mother also noted that after she was released from jail, but before an apartment was available at the Cranbrook Apartment complex, she stayed with "two different friends."

According to mother, DFPS caseworker West had requested to see the places where mother had been living during the pendency of the case.  Although appointments were set up a couple of times, they ended up being canceled either by West or mother.  West had not seen mother's current apartment, but she had asked to see it.

As to her employment status, mother testified that at the time of trial she did not have a job.  She had worked at a cleaning service from February 2022 until January 2023.

Mother also testified that she received an FSP from DFPS and DFPS caseworker West went over the FSP with her.  Mother stated that she participated in the substance-abuse assessment, as required by her FSP, and she participated in

substance-abuse counseling from September 2021 until April 2022, when she "went to jail." After being released, she reengaged in substance-abuse counseling for about two months, but she did not receive a certificate of completion for substance-abuse counseling. Mother noted that she had not received a certificate of completion from individual therapy.

Mother further explained that during the pendency of the case, she was required to participate in narcotics-use testing, according to her FSP. Mother agreed that she had been requested to submit to narcotics-use testing about twenty-four times during the case. According to mother, she had participated in narcotics-use testing four or five times, and one of those times was at the beginning of the case after the children were removed from her care. Mother also stated that she submitted to narcotics-use testing after she was released from jail around June 2022. And although mother testified that she participated in other narcotics-use testing between August 2021 and June 2022, but she could not recall when she had done so. However, mother acknowledged that she had been asked to submit to narcotics-use testing in January 2023, December 2022, November 2022, and October 2022 and she did not participate in testing when requested.

According to mother, at the time of trial, she did not have a "substance abuse issue," and she was not using narcotics when the children were removed from her care on August 16, 2021. Although mother did acknowledge that her narcotics-use

24

test from August 20, 2021 showed that she tested positive for amphetamines, methamphetamines, and methadone, but she stated that she had not used narcotics since January 26, 2015.

Additionally, at trial, mother acknowledged that she had a criminal history from "before [the children] w[ere] born." According to mother, she was convicted of four counts of the offense of forgery of a financial instrument in 2012. And during the pendency of this case, she had pleaded guilty to the offense of attempted abandonment or endangerment of a child, related to N.L.S.[18] At the time of trial, mother was on community supervision related to the offense of attempted abandonment or endangerment of a child.

As to the children, mother noted that N.L.S. called E.J.C.'s father "dad." And when the children were removed from mother's care, E.J.C. was not sick and was not underweight. Mother explained that N.L.S. was not yet in school at the time the children were removed from her care because N.L.S. had "missed the cutoff" date to start kindergarten the previous year based on his birthday. Before E.J.C. was born, mother would make N.L.S. breakfast, and N.L.S. would help her make lunch and dinner. And every other weekend, she would try to go somewhere and do something special with N.L.S.

---

[18] *See* TEX. PENAL CODE ANN. §§ 15.01 (criminal attempt), 22.041 (offense of abandoning or endangering child).

Mother also testified that she had attended visits with the children during the pendency of the case. At visits, she would play games with them or bring arts and crafts to do or toys. She was never reprimanded by DFPS for bringing the children inappropriate food or for ignoring the children during visits. Mother admitted that she had missed a recent visit with the children.

Mother stated that she was requesting that the children be returned to her care. She stated that she could provide them with food and a home. She could meet their medical needs. She wanted the children to graduate high school and go to college, and she wanted them to be happy, healthy, and succeed at anything that they wanted to do. Mother did not believe that she had neglected the children. Mother admitted that she did not have a support system if the children were returned to her care.

***Mother's FSP***

The trial court admitted into evidence a copy of mother's FSP from September 2021. The FSP lists "[f]amily [r]eunification" as DFPS's primary permanency goal as well as "[f]amily [r]elative/[f]ictive [k]in [c]onservatorship" as a concurrent permanency goal. As to "hopes and dreams" for the children, the FSP states "[f]or the children to have a safe and stable home environment free of abuse and neglect."

As to N.L.S., the FSP states that he was a healthy child. He had just started kindergarten at the time the FSP was created, and he was doing well in school. N.L.S. had not had any behavioral or emotional issues since entering DFPS's care.

26

N.L.S. appeared to have a close relationship with mother and "Frankie," who had lived with him. N.L.S. also "fit[] in well with his foster family" and had a "positive relationship[] with his foster parents." N.L.S got along well with other children.

As to E.J.C., the FSP states that she was healthy, but she was under weight for her age. At the time the FSP was created, she appeared to be "developmentally on target." E.J.C. was "an infant with no behavioral issues." She appeared to be bonded with mother. She was comfortable in her placement with her foster parents.

As to mother, the FSP states that mother reported that she "work[ed] as a home health provider for an elderly individual with health issues." Mother relied on the mother of E.J.C.'s father and "Frankie," who was a cousin of E.J.C.'s father, for support, although mother reported that Frankie was moving away. Mother did not report any issues with her cognitive abilities or any mental health diagnoses. She stated that she had "anger issues" as a teenager, and she had "dealt with depression when she lost a pregnancy in 2008." Mother acknowledged that she had used muscle relaxers and pain pills in 2008, after her pregnancy loss. Mother also reported that she had used methamphetamines in the past, but according to mother, she had not used narcotics since January 2015 when she found out that she was pregnant with N.L.S. Mother reported that she was "arrested for assault in the past but the charges were dropped." N.L.S. reported that mother and E.J.C.'s father would "fight with their hands." (Internal quotations omitted.)

27

In discussing what concerns that mother needed to address, the FSP notes that N.L.S. lacked supervision while in mother's care, and mother had tested positive for methamphetamines, amphetamines, and methadone shortly after the children were removed for her care. According to the FSP, mother had allowed N.L.S. to wander his neighborhood "for days at a time," which demonstrated that she had "issues with parenting skills."

Mother's FSP required her to remain free of alcohol and narcotics and maintain a safe and stable home that was free from criminal activity, domestic violence, alcohol and narcotics, and abuse and neglect. Mother's home needed to have fully functioning electricity, water, and gas as well as be child friendly and free of any safety hazards. If mother's home had other individuals living in it, those persons needed to not have a history with DFPS, a history of narcotics use, or a criminal history involving certain offenses. Mother needed to notify the DFPS caseworker within forty-eight hours of any changes to her home address or telephone number, and she was required to allow DFPS to make announced and unannounced visits to her home.

Further, mother was to complete a psychological evaluation and substance-abuse assessment and follow any recommendations. Mother was also required to engage in individual therapy and follow any recommendations made by the therapist regarding further treatment. And mother was required to submit to

random narcotics-use testing.[19]  Additionally, she needed to attend all court hearings and permanency planning meetings, and she was required to attend all supervised visits with the children.

### Narcotics-Use Testing Records

The trial court admitted into evidence a copy of mother's narcotics-use testing results.  The testing results show that on August 20, 2021, mother, by urinalysis, tested positive for amphetamine, methamphetamine, and methadone.  Also, on August 20, 2021, mother tested positive for amphetamine and methamphetamine by hair-follicle testing.

### Father

Father testified that he was N.L.S.'s biological father.  He participated in DNA testing during the pendency of the case and the results showed that he was N.L.S.'s biological father.[20]  Father was requesting that the trial court adjudicate him as the father of N.L.S.

Father further testified that, at the time of trial, he was incarcerated and living in the McConnell Unit in Beeville, Texas.  Father had been in confined since May

---

[19]  Mother's FSP informed her that if she failed to report to a required narcotics-use test, the test would be deemed a positive testing result.

[20]  The trial court admitted into evidence a copy of a DNA Test Report showing that father was N.L.S.'s biological father.  The report was signed on December 5, 2022—less than three months before trial began.  The trial court also admitted into evidence a copy of a DNA Test Report showing that E.J.C.'s father was not N.L.S.'s biological father.  That report was signed on July 25, 2022.

11, 2020 following his arrest. In February 2021, father was convicted of the offenses of felon in possession of a firearm,[21] possession of a prohibited weapon,[22] evading arrest or detention,[23] assault of a family member,[24] and possession of a controlled substance, namely methamphetamine.[25] Father "signed . . . a five-year plea" bargain agreement related to those offenses. Father's discharge date is in May 2025.[26] At the time of trial, he did not have a possible placement for N.L.S., and he could not provide a safe and stable home for N.L.S. because he was incarcerated.

Father also explained that in August 2021, when N.L.S. was removed from mother's care, he was incarcerated. Father's last interaction with N.L.S. occurred when N.L.S. was about three years old. Father noted that he was also incarcerated when N.L.S. was born, so he did not "have much of a relationship with him." But, according to father, N.L.S. knew who he was, and he had visited N.L.S. "[q]uite a few times." Father acknowledged that he did not know what grade N.L.S. was in at

---

[21] *See* TEX. PENAL CODE ANN. § 46.04.

[22] *See id.* § 46.05.

[23] *See id.* § 38.04.

[24] *See id.* § 22.01. Mother was not the complainant of this offense.

[25] *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115. As to the possession-of-a-controlled-substance offense, father stated that his counsel at the time told him that there "was residue in a pipe" that was "in the back bed of [father's] truck."

[26] Father stated that he had a parole hearing scheduled for March 2023, and he had "support letters . . . from the sheriff" because he was "a trustee" with the sheriff's department and worked as a welder.

30

school, did not know his favorite school subject, his favorite color, or his favorite food. He did not know "a whole lot about" N.L.S.

Father also testified that he was arrested for the offense of "theft of a firearm"[27] in 2007, and he pleaded guilty to the offense. He was then placed on community supervision. In 2009, he was convicted of the offense of assault[28] and received "time served in county jail." Further, in 2013, he was convicted of the offenses of evading arrest or detention[29] and unauthorized use of a motor vehicle.[30] And in 2014, father pleaded guilty to the offense of burglary.[31] In 2015, he pleaded guilty to the offense of "credit card abuse."[32]

As to his FSP, father testified that he received it, but it did not require him to do anything. DFPS had "dropped off [some] packets" for him about two months before trial began and he was "working on them," but they were not required by his FSP. When father met with the DFPS caseworker while incarcerated, he asked her "for things that [he] could do." The caseworker then sent him a "packet of parenting papers and stuff to fill out," and he had been "working on" that. Father was also

---

[27]     *See* TEX. PENAL CODE ANN. § 31.03.

[28]     *See id.* § 22.01.

[29]     *See id.* § 38.04.

[30]     *See id.* § 31.07.

[31]     *See id.* § 30.02.

[32]     *See id.* § 32.31.

attending GED classes, and he testified that would be starting narcotics anonymous classes. And he worked with the sheriff's department as a welder seven days a week. Father had asked DFPS about "doing video visits" with N.L.S. while he was incarcerated, but he had not received a response from DFPS. Father had not had any conduct issues while he had been incarcerated.

As to his relationship with mother, father stated that he and mother had a relationship in 2015 and 2019,[33] but they did not live together during those times. When father first met mother, mother lived with a friend in "nice house" with four or five bedrooms. Father and mother were only "together" for "[a] few months" in 2015. Mother and N.L.S. then lived with father for a couple of months in 2018 before mother chose to move with N.L.S. to Angleton, Texas. After the move, father visited N.L.S. on the weekends. Mother's new home was clean. Father believed that he last saw N.L.S. in 2019.

Father further testified that when he and mother lived together with N.L.S., mother was a good parent. She made N.L.S. dinner and gave him baths. She took good care of N.L.S., and he was "in good health." Mother took N.L.S. to doctor appointments. Mother did not "lose track" of N.L.S. or fail to take care of him. She was attentive to his needs, and father did not see anything that would cause him to be concerned about mother's parental abilities. Father and mother both took care of

---

[33] Father stated that from 2017 to 2019, he and mother "talked."

32

N.L.S. while they lived together, although father noted that he was working as a mechanic at the time. When mother and N.L.S. moved out, father did not have any concerns about mother parenting N.L.S. He did not think that she would be neglectful or endanger the child. Father did not know that mother had a history with DFPS when he let N.L.S. live with mother.

Father also noted that he and mother did not use narcotics together and he had never assaulted mother. Father did not know that mother used narcotics. Father stated that he had not provided financial support for N.L.S. since the child's birth. According to father, he had never spoken with DFPS caseworker West about mother's parental abilities.

Related to N.L.S. being removed from mother's care, father stated that mother told him that "she was in the [bed]room [of the home] asleep whenever [N.L.S.] answered the door" and saw law enforcement officers. Father was concerned that N.L.S. was in the care of DFPS. Father also noted that he did not believe it was a good idea to leave a child home alone. Father had never been inside the trailer home where N.L.S. was living at the time he was removed from mother's care.

Before father's most recent incarceration, he had been living in a home in Bandera, Texas with his ex-girlfriend.

*Father's FSP*

The trial court admitted into evidence a copy of father's FSP from September 2021. As for the permanency goal for N.L.S., it lists "[f]amily [r]eunification" or "[f]amily [r]elative/[f]ictive [k]in [c]onservatorship." It lists the "hopes and dreams" for N.L.S. as "a safe and stable home environment free from abuse and neglect."

As to N.L.S., it states that there were no health concerns, and he had no physical disability. N.L.S. was physically, cognitively, and emotionally on target for his age. N.L.S. was in kindergarten at the time and was able to understand the information that he was being taught. He had minimal behavioral issues. N.L.S. appeared to be bonded with his foster parents and comfortable in his placement. Although N.L.S. was "close" to mother, he did not have a relationship with father.

As to father, the FSP states that he was incarcerated and had a criminal history. But his physical health was unknown, whether he had any struggles with his cognitive or developmental abilities was unknown, and his mental health history was unknown. The FSP does not list any requirements for father to complete to ensure the return on N.L.S., other than to contact DFPS upon his release from confinement.

*Father's Criminal History*

The trial court admitted into evidence of a copy of an indictment, dated June 20, 2019, which alleged that father, on or about May 14, 2019, "intentionally or knowingly possess[ed] a controlled substance listed in Penalty Group One (1),

34

namely, methamphetamine[,] and the amount of said controlled substance was, by aggregate weight, including any adulterants and dilutants, less than one (1) gram."[34] The indictment further alleged that, previously, on or about December 13, 2013, father, in cause number 13CR2189, in the 10th District Court of Galveston County, Texas, was convicted of the felony offense of evading arrest or detention with a vehicle,[35] and in cause number 13CR2190, in the 10th District Court of Galveston County, father was convicted of the felony offense of unauthorized use of a vehicle.[36] Further, on or about February 10, 2014, father, in cause number 67200, in the 23rd District Court of Brazoria County, Texas, was convicted of the felony offense of burglary.[37] And father, on or about May 7, 2015, in cause number 15-DCR-068775, in the 400th District Court of Fort Bend County, Texas, was convicted of the felony offense of credit card abuse.[38]

The trial court also admitted into evidence a copy of father's plea agreement related to the May 14, 2019 possession-of-a-controlled-substance offense, which shows that in exchange for father's plea of guilty, the State waived the alleged

---

[34]     *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115.

[35]     *See* TEX. PENAL CODE ANN. § 38.04.

[36]     *See id.* § 31.07.

[37]     *See id.* § 30.02.

[38]     *See id.* § 32.31.

35

enhancements and agreed to recommend that father's punishment be assessed at 645 days confinement.

A judgment of conviction, signed on July 15, 2022, related to the May 14, 2019 possession-of-a-controlled-substance offense, a copy of which the trial court admitted into evidence, shows that father pleaded guilty to the offense, and the trial court, in accord with the agreed punishment recommendation from the State, assessed father's punishment at confinement for 645 days. Father received a jail time credit of 631 days.

Additionally, the trial court admitted into evidence a copy of an indictment, alleging that father, on or about November 26, 2011, "intentionally or knowingly enter[ed] a building not then open to the public, owned by [the complainant], without the effective consent of [the complainant], and therein attempted to commit or committed theft."[39] Other documents[40] admitted into evidence show that father, with an agreed punishment recommendation from the State, pleaded guilty to the offense of burglary, and the trial court deferred adjudication of father's guilt and placed him on community supervision for three years. The State, alleging that father had violated the conditions of his community supervision, subsequently moved to

---

[39] *See id.* § 30.02.

[40] These documents include copies of an order of deferred adjudication signed on June 21, 2012, a "State Jail Felony Deferred Adjudication Supervision Order," setting the conditions of father's community supervision, and a plea agreement between father and the State related to the burglary offense.

adjudicate father's guilt.[41]   Father then signed a plea agreement related to the State's motion to adjudicate his guilt, in which he agreed to plead true to certain allegations in the State's motion, in exchange for the State recommending that punishment be assessed at confinement for eight months.  A copy of the judgment adjudicating guilt, which the trial court admitted into evidence, shows that in February 2014, the trial court found the allegations true and assessed father's punishment at confinement for eight months, to run concurrently.  Father received a jail time credit of 182 days.

Further, the trial court admitted into evidence a copy an information, alleging that father, on July 10, 2009, "intentionally, knowingly or recklessly cause[d] bodily injury to another, namely, [the second complainant], a person with whom [appellant] ha[d] . . . a dating relationship, by head butting [the second complainant] on her forehead with his head and making her fall to the ground" and father "intentionally, knowingly or recklessly cause[d] bodily injury to [the second complainant], a person with whom [he] ha[d] . . . a dating relationship by choking her on the neck with his hand."[42]  A copy of the judgment, which the trial court admitted into evidence, states that father pleaded guilty to the misdemeanor offense of assault, and the trial court

---

[41]   A copy of the State's motion to adjudicate guilt, which was filed on August 12, 2013, was admitted into evidence at trial.

[42]   *See id.* § 22.01.  The trial court also admitted into evidence a copy of the complaint related to the assault offense.

assessed father's punishment at confinement for three days in the county jail and a fine of $300. Father received a "jail time credit" of fourteen days. The trial court entered a finding that father had committed family violence.

The trial court also admitted into evidence a copy of an indictment, alleging that father, on or about November 6, 2007, "intentionally or knowingly, unlawfully appropriate[d] by acquiring or exercising control over property, namely, a firearm owned by [the third complainant]," "without the effective consent of [the third] [c]omplainant and with intent to deprive the [third] [c]omplainant of said property."[43] A copy of father's plea agreement, which was admitted into evidence, shows that father agreed to plead guilty to the misdemeanor offense of theft of a firearm, in exchange for the State recommending that his punishment be assessed at confinement for 100 days in the county jail. The trial court admitted into evidence a copy of a judgment, signed on December 5, 2008, showing that father pleaded guilty to the misdemeanor offense of theft of a firearm and the trial court, in accord with the agreed punishment recommendation from the State, assessed father's punishment at confinement in the county jail for 100 days. Father received a jail time credit of 111 days.

---

[43]     *See id.* § 31.03.

*Guardian Ad Litem for Children*

Claudia Sullivan, the guardian ad litem for the children, testified that she believed that the parental rights of mother and father should be terminated. As to mother, Sullivan stated that mother's parental rights to the children should be terminated because she failed to comply with her FSP and failed to participate in required narcotics-use testing during the pendency of the case. According to Sullivan, mother only participated in two out of twenty-four required narcotics-use tests, and she tested positive for methamphetamine. Sullivan also noted that mother, at the time of trial, was "on probation" related to a misdemeanor offense, and she was living with E.J.C.'s father[44] "on an on-and-off basis," which contributed to Sullivan's recommendation that mother's parental rights to the children be terminated.

As to father, Sullivan testified that he had not "had any interaction with" N.L.S. Although father was incarcerated, he "still ha[d] the ability to write [N.L.S.], to send little notes or to even make arrangements to have some type of communication . . . with him." Sullivan was concerned about father's criminal history and that N.L.S. had "no emotional connection" to father. N.L.S believed that E.J.C.'s father was his father.

---

[44] Sullivan noted that E.J.C.'s father had not completed any requirements of his FSP.

Sullivan further testified that it was in the children's best interest to have a safe and stable home. And the conduct of mother and father had "subjected the children to a life of uncertainty and instability that[] [was] endangering their physical and emotional well-being." The children would be harmed by being "in a state of flux" should they be returned to the care of mother or father because either parent could be "going to . . . jail one day or the next."

Sullivan also explained that E.J.C. was young, and "[t]he only people she[] [had] ever known in her life that ha[d] given her stability [were her] foster parents," and she referred to them as "her parents." E.J.C. was "very well-settled in" her foster parents' household. As to N.L.S., Sullivan noted that his fears about being placed with mother were "magnified after he ha[d] been at a visit" with mother. However, she testified that N.L.S. was also bonded with mother and that mother had visited N.L.S. on a weekly basis throughout the pendency of the case, except for when she was "in jail."

According to Sullivan, "a family [had been] identified that [were] willing to adopt [the children]" and that family "want[ed] to be made the placement[] for [the children]." They had known the children for more than a year, and they would "have the [children's current foster] parents . . . close by, as they [were] all a tight-knit family." A background check had been performed related to the family interested in adopting the children. And Sullivan had spoken to the family about their hopes

and dreams for the children, which factored into Sullivan's decision to recommend termination of the parental rights of mother and father.

**Standard of Review**

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction

as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).  Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate.  *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266.  In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."  *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted).  However, this does not mean that we must disregard all evidence that does not support the finding.  *In re J.F.C.*, 96 S.W.3d at 266.  Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis.  *Id.*  If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we

must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

## Termination of Mother's Parental Rights

In her first and second issues, mother argues that the trial court erred in terminating her parental rights to the children because the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being, she engaged, or knowingly

43

placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being, she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children, and termination of her parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (b)(2). In her third issue, mother argues that the trial court erred in appointing DFPS as the sole managing conservator of the children because a parent should be named the children's managing conservator where the evidence does not show that the appointment would significantly impair the children's physical health or emotional development.

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the children. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the children as determined by the trier of fact. *See id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child[ren's] best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A.    Endangerment

In a portion of her first issue, mother argues that the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being because there was "no evidence that mother used narcotics in the presence of the children" or that narcotics were "accessible to the children"; there were not "issues with the [trailer] home" where the children were living; there was no evidence "that E.J.C. was endangered by . . . mother"; the children were healthy and developmentally on target at the time they were removed from mother's care; the only evidence presented as to narcotics use were the results of one narcotics-use test and mother's failure to submit to narcotics-use testing; and mother was only convicted of a misdemeanor offense during the pendency of the case.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E).

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that a parent has "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional well-being." *Id.* § 161.001(b)(1)(D).  A trial court may also order termination of the parent-child relationship if it finds by clear and

45

convincing evidence that the parent has "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed] the[ir] physical or emotional well-being." *Id.* § 161.001(b)(1)(E). Because the evidence related to Texas Family Code sections 161.001(b)(1)(D) and (E) are interrelated, we consolidate our examination. *See In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *12 n.38 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.); *In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.).

Both Texas Family Code sections 161.001(b)(1)(D) and (E) require proof of endangerment. To "endanger" means to expose the children to loss or injury or to jeopardize their emotional or physical health. *Boyd*, 727 S.W.2d at 533 (internal quotations omitted); *see also Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The children are endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Fam. & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. However, it is not

necessary that the endangering conduct be directed at the children or that the children actually suffer injury. *Id.*

While Texas Family Code sections 161.001(b)(1)(D) and (E) both focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the children. *See In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.). For instance, Texas Family Code section 161.001(b)(1)(D) focuses on the children's surroundings and environment and requires a showing that the environment in which the children were placed endangered their physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied); *see also In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d at 477. "Environment" refers to the acceptability of the children's living conditions as well as the conduct of a parent or other person in the home because the conduct of a parent or other person can create an environment that endangers the children's physical or emotional well-being. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (internal quotations omitted); *see also In re I.L.L.*, No. 14-09-00693-CV, 2010 WL 4217083, at *6 (Tex. App.—Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem. op.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) ("It is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the

47

home of a child, or with whom a child is compelled to associate on a regular basis in his home, are not inherently a part of the 'conditions and surroundings' of th[e] . . . home . . . ."). Thus, although Texas Family Code section 161.001(b)(1)(D) focuses on the children's living environment, parental conduct may produce an endangering environment. *See In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *12 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.).

The relevant time frame for establishing that a parent knowingly placed, or allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being is prior to the children's removal. *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied); *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). A fact finder may infer from a parent's past conduct endangering the well-being of the children that similar conduct will recur in the future. *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.); *see also In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.) (trier of fact may measure parent's future conduct by his past conduct). Notably, DFPS does not need to establish that a parent intended to endanger the children to support termination based on endangerment. *In re J.H.*, 2023 WL 2169952, at *13. Texas Family Code section 161.001(b)(1)(D) permits termination based upon a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Under Texas Family Code section 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical or emotional well-being was the direct result of a parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d at 125; *see also In re S.M.L.*, 171 S.W.3d at 477. It is not necessary to establish that a parent intended to endanger the children to support termination of the parent-child relationship. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). However, termination under section 161.001(b)(1)(E) requires "more than a single act or omission; . . . a voluntary, deliberate, and conscious course of conduct by the parent" is required. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *see also In re J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the children and they suffer no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Courts may consider parental conduct that did not occur in the children's presence. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Walker*, 312 S.W.3d at 617.

Officer Bilbrey testified that on August 16, 2021, she went to mother's trailer home about 5:20 p.m. in response to a call for a welfare check. Bilbrey did not see any cars in the driveway of the home, and when she knocked on the front door,

N.L.S., who was five years old at the time, answered. Bilbrey asked N.L.S. if mother was home, and N.L.S. told her that he was "home alone" and "mother [was] not [t]here." N.L.S. also told Bilbrey that he did not know where mother was. Bilbrey then entered the home and yelled, "Holiday Lakes Police Department," but no one responded. (Internal quotations omitted.) Bilbrey continued shouting and banged on the bedroom door in the home, which was locked. As she banged on the bedroom door, she yelled, "Holiday Lakes Police Department. Is anybody home?" (Internal quotations omitted.) No one responded. Bilbrey was in N.L.S.'s home for five to ten minutes knocking on doors and yelling, but she never received a reply.

According to Officer Bilbrey, she stayed at the trailer home with N.L.S. for about fifteen to thirty minutes. Around 5:45 p.m., she left the home with N.L.S., and brought him to the HLPD station, which was about three blocks away from the trailer home. During the entire time that Bilbrey was at the trailer home on August 16, 2021, no adult was present with N.L.S.

Officer Bilbrey further explained that mother did not come looking for N.L.S. at the HLPD station. Around 7:00 p.m., another law enforcement officer went back to the trailer home. Mother was finally located around 7:45 p.m., and mother arrived at the HLPD station around 8:00 p.m. that night. Although mother told Bilbrey that she had been sleeping in the bedroom when Bilbrey first came to the trailer home around 5:20 p.m. that day, Bilbrey testified that the door to the bedroom was locked

and she did a "cop knock" on the bedroom door loudly. She did not hear a response from anyone on the other side of the bedroom door, where mother was purportedly sleeping.

Additionally, Officer Bilbrey testified that she went back to the trailer home around 10:00 p.m. to pick up E.J.C., who was two-months old at the time. Another adult, "Frankie," was at the home with E.J.C. Frankie and Bilbrey both looked around the home for formula for E.J.C., but they could only find enough formula to make one two-ounce bottle. And although Frankie gave Bilbrey a car seat for E.J.C., it was "[d]irty." Frankie did not give Bilbrey any clothes that fit E.J.C., and Frankie told Bilbrey that she had been gone from the home all day.

Officer Newberry testified that on August 16, 2021, she went to mother's trailer home around 5:20 p.m. to perform a welfare check with Officer Bilbrey. When they arrived at the home, Bilbrey knocked on the front door, and N.L.S. answered. N.L.S. told the officers that he was home alone and that "nobody was home" with him. (Internal quotations omitted.) Bilbrey then entered the home to determine whether any other person was present. Bilbrey knocked loudly and yelled loudly while inside the trailer home. In Newberry's opinion, if someone was home, she "would have known [that Bilbrey] was in the house." Bilbrey tried to open the bedroom door in the trailer home, but it was locked. Bilbrey did not find anyone else in the home other than N.L.S. Newberry estimated that she and Bilbrey were at

51

the trailer home for about thirty to forty-five minutes before they left and brought N.L.S. to the HLPD station. Newberry bought food for N.L.S. to eat at the station.

Officer Newberry further testified that around 7:00 p.m. that night, she went back to the trailer home to see if anyone was there, but there were still no cars in the driveway. At the trailer home, Newberry pounded on the door and yelled, but no one answered.

At 7:24 p.m., law enforcement officers received a message from a neighbor stating that there was a car in the trailer home's driveway, and Officer Newberry returned to the trailer home at about 7:36 p.m., along with Officer Bilbrey. Newberry knocked on the front door of the home, and a woman, "Frankie," answered. Newberry identified herself and said that she was looking for mother. Frankie indicated that mother was inside the home. Bilbrey then spoke with mother and asked mother if she knew where N.L.S. was. Mother responded that N.L.S. was "out playing at a friend's house," and then Bilbrey told mother that N.L.S. was at the HLPD station. Mother indicated to Bilbrey that the last time she had seen N.L.S. was "a few hours" before the officers' arrival. Bilbrey and Newberry then requested that mother come to the HLPD station, which was a few blocks away from the trailer home.

According to Officer Newberry, she and Officer Bilbrey arrived back at the HLPD station at about 7:45 p.m., but mother did not show up. Thus, at about

52

8:00 p.m., Newberry went back to the trailer home to find mother. Newberry found mother "fiddling with something on the front porch, [and] kind of going in and out" of the trailer home. Mother and Frankie were talking. Newberry told mother that "she needed to come now," and she did not leave the home until mother followed her back to the HLPD station.

The trial court admitted into evidence a copy of a HLPD incident report related to the events on August 16, 2021. It lists mother as the "[s]uspect/[o]ffender" and the offense as abandoning or endangering a child.[45] The "[n]arrative[]" portion of the incident report states that Officer Newberry and Officer Bilbrey received a telephone call from a Holiday Lakes resident about a five-year old child, N.L.S., who had been at her home for the past few days. N.L.S. had been spending all day at the resident's home with "no parent coming by to check on him." The resident reported that N.L.S. had arrived at her home each day dirty, hungry, with no shoes, and in the same clothes. On August 16, 2021, N.L.S. showed up at the resident's home at about 8:00 a.m., with a fish tank and some other belongings in his hands. He asked the resident if he could move in with her because "his mom [had] kicked him out of [h]is home." N.L.S., "with tears in his eyes," told the resident that he had been kicked out of his home "because he was trying to fill his fish tank up." When the resident had to leave her home later that day, she told N.L.S. that he needed to

---

[45] *See* TEX. PENAL CODE ANN. § 22.041.

go home until she returned. As she drove by N.L.S.'s home, she saw N.L.S. sitting on the front porch of his home holding his fish tank. The resident decided to report the incident to the HLPD.

The narrative portion of the incident report further states that Officer Newberry and Officer Bilbrey told the resident that they would go by N.L.S.'s home and perform a welfare check and see who else was at the home. Newberry and Bilbrey arrived at the home, located in Holiday Lakes, at about 5:20 p.m. Newberry noticed "a lot of garbage and shoes and many more random objects all over the front yard and porch area of the home." And when Newberry and Bilbrey went to the front door of the home, "there was a very strong smell of ammonia," which was concerning to the officers. Although the screen door was closed, the main front door to the home was open. Bilbrey knocked on the door, and N.L.S. came and opened the screen door for the officers. When the officers asked N.L.S. if anyone was home with him, he replied, "No, my mom is not home right now, but I have her cell[ular] [tele]phone." (Internal quotations omitted.) Newberry and Bilbrey then yelled into the home, "Holiday Lakes Police Department, is anyone in the home?" (Internal quotations omitted.) And N.L.S. kept repeating that "no one was [t]here." After Bilbrey entered the home, she "looked in the rooms to confirm that no one was there."

Additionally, the incident report notes that the bedroom door in the home was locked, so Officer Bilbrey knocked on the door and yelled, "Holiday Lakes Police is anyone home?" But no one responded. Bilbrey and N.L.S. then sat on the front porch of the home, and Officer Newberry stepped away to call DFPS. Newberry was instructed to bring N.L.S to the HLPD station with the officers. At about 5:44 p.m., Newberry and Bilbrey left the home with N.L.S. and brought N.L.S. to the HLPD station, where they arrived at 5:47 p.m. Newberry left Bilbrey and N.L.S. at the station and went to pick up food for N.L.S. because he stated that he was hungry and that he had not eaten anything that day.

The incident report additionally notes that at about 7:00 p.m., Officer Newberry returned to N.L.S.'s home "to see if anyone showed up looking for him," but no one was there. Newberry then went back to the HLPD station, and at 7:24 p.m., law enforcement officers "received a message that a gray [car had been] seen in the driveway of [the] home." This prompted Newberry and Officer Bilbrey to return to the home, and when they did, they saw a gray car parked in the driveway. The officers approached the home and knocked on the front door. A woman, who identified herself as "Frankie," answered the door, and the officers asked Frankie if mother was home. Frankie got mother out of a room in the home, telling her that "the cops [were] [t]here for [her]." Mother came out to the front porch holding an infant in her arms. Newberry asked mother if she knew where N.L.S. was, and

55

mother responded that he was "[d]own the road at a friend's house." (Internal quotations omitted.) Newberry asked mother when she last saw N.L.S., and she stated that she had seen him that morning, but she was not sure of the exact time. Mother also told Newberry that she had been at the home all day. Newberry then told mother that N.L.S. was at the HLPD station, he was speaking to a "social worker," and mother needed to come to the station. Mother replied that she would meet the officers at the station.

Officer Newberry and Officer Bilbrey arrived back at the HLPD station at about 7:45 p.m. When mother had not arrived at the HPLD station by 8:00 p.m., Newberry went back to the home and found mother outside. Newberry told mother that she needed to come to the HLPD station right then and that Newberry would follow her to the station to make sure that mother "got there ok."

Attached to the HLPD incident report is a voluntary statement from the Holiday Lakes resident who contacted law enforcement officers about N.L.S. on August 16, 2021. In her voluntary statement, the resident states that N.L.S. was five-years old and had been at her home "all day" for the past four days. She was concerned about N.L.S. because he had been at her house "so often [and] for so long [and] . . . mother never came around." The resident had "never met" mother.

According to the resident, on August 16, 2021, N.L.S. came to the resident's home at 8:00 a.m. and asked her "if he could live with [her] because . . . mother [had]

56

kicked him out because he was filling up his fish tank."[46] N.L.S. "got teary eyed," and the resident let him into her house and fed him. At about 2:00 p.m., the resident told N.L.S. "to go home," but he came back less than fifteen minutes later and said that mother had "kicked him out again." Later, when the resident had to leave her home, she asked N.L.S. if she could "drop[] him off at home" and he told her that "he was going to get a spanking from" mother. When the resident drove by N.L.S.'s home at about 5:00 p.m., she saw him sitting on the front porch. The resident noted that on August 16, 2021, N.L.S. was wearing shoes, but on the other days that he was at her home, he showed up barefoot, hungry, and wearing the same clothes.

A parent's failure to properly supervise her young child endangers the child's physical or emotional well-being. *See In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *10–11 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.) (parent's failure to supervise her child created dangerous condition for child); *In re J.H.*, No. 07-21-00059-CV, 2021 WL 2693284, at *3 n.4 (Tex. App.—Amarillo June 30, 2021, pet. denied) (mem. op.); *In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *14 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.). And evidence that a parent has failed to supervise her young child supports the

---

[46] Mother, during her testimony, acknowledged that N.L.S. had a fish tank but stated that he did not have a fish in the tank. Further, according to mother, she sent N.L.S. down to the neighbor's home on the morning of August 16, 2021 so that he could get his shoes, which he had left there. Mother denied kicking N.L.S. out of the house.

trial court's finding that the parent "knowingly placed or knowingly allowed [her] child to remain in conditions or surroundings which endanger[ed] [his] physical or emotional well-being" or that the parent "engaged in conduct . . . which endanger[ed] the physical or emotional well-being of the child."[47]  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *see also In re M.C.*, 917 S.W.2d at 269–70; *In re I.F.*, No. 01-22-00375-CV, 2022 WL 16640627, at *5 (Tex. App.—Houston [1st Dist.] Nov. 3, 2022, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support trial court's finding that parent knowingly placed or knowingly allowed her child to remain in conditions or surroundings that endangered her physical or emotional well-being where parent left child unsupervised in hotel room); *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *17–20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support trial court's finding parent engaged in conduct that endangered child's physical and emotional well-being where child outside wandering around without parent).

Further, parental neglect of a child can be as dangerous to the well-being of the child as direct physical abuse.  *See In re A.K.T.*, 2018 WL 6423381, at *14.  And

---

[47]    Although there is no evidence that mother failed to properly supervise E.J.C., a fact finder can infer from the neglect of one child that the physical and emotional well-being of the other children in the home were also jeopardized.  *See In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.).

neglect by a parent of a child's physical needs can support a finding of endangerment. *See In re R.H.*, No. 06-20-00083-CV, 2021 WL 1704264, at *9 (Tex. App.—Texarkana Apr. 30, 2021, pet. denied) (mem. op.); *see also In re M.C.*, 917 S.W.2d at 270 (neglect of children's physical needs can be just as dangerous to well-being of children as direct physical abuse). As discussed above, the evidence presented at trial showed that N.L.S., in the days before he was removed from mother's care, was seen on multiple occasions hungry, barefoot, in the same clothes, and without supervision. Further, as to E.J.C., on the day she was removed from mother's care, she appeared underweight and there was a limited amount of formula for E.J.C. in mother's home and no appropriate clothing for that child.[48] *See In re A.N.*, No. 02-14-00206-CV, 2014 WL 5791573, at *19 (Tex. App.—Fort Worth Nov. 6, 2014, no pet.) (mem. op.) (record contained evidence of neglect where children asked strangers for food and did not wear shoes); *see also In re L.W.*, No. 02-18-00107-CV, 2018 WL 3385694, at *5 (Tex. App.—Fort Worth July 12, 2018, pet. denied) (mem. op.) (parent's failure to provide food for children constituted voluntary conduct that endangered children).

Additionally, we note that this Court has previously stated that illegal narcotics use and its effect on an individual's ability to parent may constitute an

---

[48]    A fact finder can infer from the neglect of one child that the physical and emotional well-being of the other children in the home were also jeopardized. *See id.*

59

endangering course of conduct.  *See In re A.A.M.*, 464 S.W.3d 421, 426–27 (Tex. App.—Houston [1st Dist.] 2015, no pet.).  And we have concluded that illegal narcotics use by a parent may support termination under Texas Family Code section 161.001(b)(1)(D) and (E).  *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *15–16 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) ("[I]llegal narcotics use by a [parent] supports the conclusion that the children's surroundings endangered their physical or emotional well-being."); *Walker*, 312 S.W.3d at 617–18; *see also In re E.L.C.*, No. 05-20-00373-CV, 2020 WL 5494415, at *9 (Tex. App.—Dallas Sept. 11, 2020, no pet.) (mem. op.); *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).  Further, evidence that a parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being.  *See In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied); *Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

DFPS investigator Mendoza and DFPS caseworker West both testified that DFPS was concerned about possible narcotics-use by mother during the pendency of the case.  According to Mendoza, mother had admitted that she had used

60

methamphetamines in the past. And Dr. Stadler, who conducted mother's psychological evaluation, testified that mother admitted that she had used marijuana, methamphetamine, cocaine, alcohol, and ecstasy in the past. Mother told Dr. Stadler that she began using marijuana and methamphetamines when she was twelve years old. She started drinking alcohol when she was fourteen or fifteen years old, and she used "acid once in [ninth] grade." Mother used opioids when she was about twenty-five or twenty-six years old.[49]

Although at trial mother denied having a "substance abuse issue" and stated that she had not used narcotics since January 26, 2015, she also acknowledged that her narcotics-use testing results from August 20, 2021 showed that she tested positive for amphetamines, methamphetamines, and methadone days after the children were removed from her care. A copy of mother's narcotics-use testing results from August 20, 2021, which was admitted into evidence at trial, show that mother tested positive by urinalysis for amphetamine, methamphetamine, and methadone. And mother tested positive for amphetamine and methamphetamine by hair-follicle testing.[50]

---

[49] Mother's FSP states that mother reported that she had previously used muscle relaxers and pain pills in 2008, and mother reported using methamphetamines in the past.

[50] Mother's FSP similarly notes that mother tested positive for methamphetamines, amphetamines, and methadone after the children were removed from her care.

DFPS caseworker West and mother both agreed that mother had been asked to submit to twenty-four narcotics-use tests during the pendency of the case, and mother failed to participate in virtually all of the requested narcotics-use tests.[51] *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (fact finder could reasonably infer parent's failure to complete scheduled narcotics-use screenings indicated she avoided testing because she had used narcotics); *see also In re A.K.T.*, 2018 WL 6423381, at *13 (considering parent failed to submit to narcotics-use testing on numerous occasions during course of case when holding evidence legally and factually sufficient to support finding parent engaged in conduct that endangered child's physical and emotional well-being). Further, mother failed to complete substance-abuse counseling, which she was required to do under her FSP, and she stopped attending substance-abuse counseling about six months before trial.

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in

---

[51] Mother's FSP required mother to remain free of alcohol and narcotics during the pendency of the case. And mother's FSP informed her that if she failed to submit to a required narcotics-use test, the test would be deemed a positive testing result.

conduct that endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E).

Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being. And any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's findings that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E).

We overrule a portion of mother's first issue.

Having held that the evidence is legally and factually sufficient to support the trial court's findings that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical or emotional well-being, we need not address the remaining portion of mother's first issue in which she asserted that the evidence was legally and factually insufficient to support the trial court's finding that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children. *See id.* § 161.001(b)(1)(D), (E), (O); *In re A.V.*, 113 S.W.3d at 362 (only one predicate finding under Texas Family Code section 161.001(b)(1) necessary to support judgment of termination); *In re M.A.J.*, 612 S.W.3d 398, 408 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *see also* TEX. R. APP. P. 47.1.

**B.** **Best Interest of Children**

In her second issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children because the children were young and bonded with mother, mother visited the children weekly during the pendency of the case, mother explained "some of the ways in which she cared and parented each child," E.J.C.'s father would stop living with mother if the children were returned to her care, there was no evidence that mother's relationship with the children was inappropriate, DFPS "offered no evidence of either child at their current placement," mother's failure to complete the requirements of her FSP was not determinative, and "the record . . . d[id] not show that mother did not meet the children's physical and emotional needs while they were previously in her care."

The best-interest analysis evaluates the best interest of the children. *See In re M.A.A.*, 2021 WL 1134308, at *20; *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). It is presumed that the prompt and permanent placement of the children in a safe environment is in their best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the children's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination

proceedings in favor of the parent. *See In re M.A.A.*, 2021 WL 1134308, at *20; *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In determining whether the termination of mother's parental rights was in the best interest of the children, we may consider several factors, including: (1) the desires of the children; (2) the current and future physical and emotional needs of the children; (3) the current and future emotional and physical danger to the children; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the children by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions.[52] *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

We note that the above listed factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d

---

[52] We noted that much of the evidence discussed below applies to multiple factors.

382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the children's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J. G. S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d at 27; *see also In re J. G. S.*, 574 S.W.3d at 122.

The same evidence of acts and omissions used to establish grounds for termination under Texas Family Code section 161.001(b)(1) may also be relevant to determining the best interest of the children. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the children. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1.     Children's Desires

When mother's parental rights were terminated, N.L.S. was seven-and-a-half years old and E.J.C. was almost twenty-two months old.  Neither child directly expressed a desire as to whether he or she wish to be returned to mother's care or remain in their current placement.

When there is no specific evidence of the children's desires or the children are too young to express those desires, a fact finder may consider evidence that the children are bonded with their foster family and receive good care in their current placement.  *See In re L.W.*, 2019 WL 1523124, at *18; *In re L.M.N.*, 2018 WL 5831672, at *20.

Sullivan, the guardian ad litem for the children, testified that because of E.J.C.'s young age, the children's foster parents were "[t]he only people she[] [had] ever known in her life that ha[d] given her stability."  E.J.C. referred to the children's foster parents as "her parents," and according to Sullivan, E.J.C. was "very well-settled in" the foster parents' home.  Sullivan noted that N.L.S. had expressed some fear about being returned to mother's care.

Further, mother's FSP states that while in the care of his foster parents, N.L.S. was doing well in school and had not had any behavioral or emotional issues.  N.L.S. "fit[] in well with his foster family" and had a "positive relationship[] with his foster

parents." As to E.J.C., mother's FSP notes that she was comfortable in her placement with her foster parents.

However, Sullivan also acknowledged that N.L.S. was bonded with mother and mother had visited N.L.S. on a weekly basis throughout the pendency of the case, except for when she was "in jail." And mother's FSP states that E.J.C. appeared to be bonded with mother. Further, DFPS caseworker West agreed that mother had attended most of her weekly supervised visits with the children and mother did not act inappropriately at visits. Mother brought food and sometimes clothing to the visits, and mother engaged with the children at her visits. West acknowledged that the children "adore[d]" mother.

Although "[a] child's love for [his] natural parent is an important consideration in the best interest determination," "[e]ven where a child is attached to a parent, . . . [a] child's desire to be returned to the parent [is] not . . . dispositive of the best interest analysis," especially "if the parent has engaged in conduct dangerous to the child's well-being." *In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *9 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.); *see also In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *19 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (even though children appeared happy to see parent at visits, that was not dispositive of best-interest analysis).

## 2. Current and Future Physical and Emotional Danger

### a. *Criminal Conduct and Violence*

A parent's criminal history is relevant in analyzing the present and future emotional and physical danger to a child and whether a parent can provide a safe and stable home for her child. *See In re D.J.G.*, No. 01-22-00870-CV, 2023 WL 3513143, at *20 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet.) (mem. op.); *see also In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *18–19 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.); *In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (evidence of parent's criminal history may support trial court's finding termination of parental rights in children's best interest). And "[a]s a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child." *In re R.W.*, 129 S.W.3d at 739. Further, parental violence is relevant when considering the best interest of the child. *See In re D.J.G.*, 2023 WL 3513143, at *19.

Mother testified that she was previously convicted of four counts of the offense of forgery of a financial instrument in 2012. And she acknowledged that during the pendency of the case, she had pleaded guilty to the offense of attempted abandonment or endangerment of a child, related to her failure to properly supervise

70

N.L.S. in August 2021—which was the impetus for the children being removed from her care.[53] At the time of trial, mother stated that she was on community supervision related to the offense of attempted abandonment or endangerment of a child. According to mother's FSP, mother had been "arrested for assault in the past but the charges were dropped."

DFPS caseworker West explained that during the pendency of the case, mother was in "jail" from April 29, 2022 until June 4, 2022. And according to West, at the time of trial, mother was "on probation." Mother missed visitations with the children when she was "in jail."

As to whether mother had ever engaged in physical altercations with others, Dr. Stadler, who conducted mother's psychological evaluation, explained that mother reported that she had been involved in physical altercations as a child and as an adult. Her last physical altercation was with the girlfriend or ex-girlfriend of E.J.C.'s father. Mother also indicated that she was involved in another physical altercation in 2014. According to mother's FSP, N.L.S. reported to DFPS that mother and E.J.C.'s father would "fight with their hands." (Internal quotations omitted.) *See In re J.B.M.*, No. 04-18-00717-CV, 2019 WL 1139858, at *2 (Tex. App.—San Antonio Mar. 13, 2019, pet. denied) (mem. op.) ("Domestic violence and

---

[53] *See* TEX. PENAL CODE ANN. §§ 15.01 (criminal attempt), 22.041 (offense of abandoning or endangering child).

71

a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the children's presence, were not directed at the children, or did not cause actual injury to the children."); *In re A.V.M.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi–Edinburg May 9, 2013, pet. denied) (mem. op.) ("It is self[-]evident that parents perpetrating violence towards certain members of the family threaten the emotional development and well-being of any child."); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

b. *Narcotics Use*

Illegal narcotics use by a parent may constitute evidence of current and future danger to a child. *See In re D.J.G.*, 2023 WL 3513143, at *23; *In re O.J.P.*, No. 01-21-00163-CV, 2021 WL 4269175, at *19–21 (Tex. App.—Houston [1st Dist.] Sept. 21, 2021, no pet.) (mem. op.) (considering evidence of parent's narcotics use in determining current and future danger to child); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (stating "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct"); *In re S.R.H.*, No. 01-15-0714-CV, 2016 WL 430462, at *10–11 (Tex. App.—Houston [1st Dist.] Feb. 4, 2016, no pet.) (mem. op.) (parent's past narcotics use is indicative of

instability in home environment); *Cervantes-Peterson*, 221 S.W.3d at 254–55 (illegal narcotics use while parental rights are in jeopardy may be considered endangering course of conduct critical to finding that termination is in child's best interest).

DFPS investigator Mendoza and DFPS caseworker West both testified that DFPS was concerned about possible narcotics-use by mother during the pendency of the case. According to Mendoza, mother had admitted that she had used methamphetamines in the past. And Dr. Stadler, who conducted mother's psychological evaluation, testified that mother admitted that she had used marijuana, methamphetamine, cocaine, alcohol, and ecstasy in the past. Mother told Dr. Stadler that she began using marijuana and methamphetamines when she was twelve years old. She started drinking alcohol when she was fourteen or fifteen years old, and she used "acid once in [ninth] grade." Mother used opioids when she was about twenty-five or twenty-six years old.[54]

Although at trial mother denied having a "substance abuse issue" and stated that she had not used narcotics since January 26, 2015, she also acknowledged that her narcotics-use testing results from August 20, 2021 showed that she tested positive for amphetamines, methamphetamines, and methadone only days after the

---

[54] Mother's FSP also states that mother reported that she had used muscle relaxers and pain pills in 2008, and mother reported using methamphetamines in the past.

children were removed from her care. A copy of mother's narcotics-use testing results from August 20, 2021, which was admitted into evidence at trial, show that mother tested positive by urinalysis for amphetamine, methamphetamine, and methadone, and mother tested positive for amphetamine and methamphetamine by hair-follicle testing.[55]

DFPS caseworker West and mother both agreed that mother had been asked to submit to twenty-four narcotics-use tests during the pendency of the case, and mother failed to participate in virtually all of the requested narcotics-use tests.[56] *See In re W.E.C.*, 110 S.W.3d at 239 (fact finder could reasonably infer parent's failure to complete scheduled narcotics-use screenings indicated she avoided testing because she had used narcotics); *see also In re T.L.S.*, 2012 WL 6213515, at *6 (considering evidence of parent's refusal to take court-ordered narcotics-use test in determining best interest of child). Further, mother failed to complete substance-abuse counseling, which she was required to do under her FSP, and she stopped attending substance-abuse counseling about six months before trial. *See In re D.J.G.*, 2023 WL 3513143, at *24 (considering parent had not completed all

---

[55] Mother's FSP similarly notes that mother tested positive for methamphetamines, amphetamines, and methadone after the children were removed for her care.

[56] Mother's FSP required mother to remain free of alcohol and narcotics during the pendency of the case. And mother's FSP informed her that if she failed to report to a required narcotics-use test, the test would be deemed a positive testing result.

requirements of his FSP related to his substance abuse issues in determining best interest of child).

### 3. Current and Future Physical and Emotional Needs, Parental Abilities, Plans for Children, and Stability of Proposed Placement

#### a. *Children's Needs*

There is nothing in the trial record to establish that the children's physical and emotional needs differ in any respect to those of other children their ages. *See In re E.N.C.*, 384 S.W.3d at 808 (noting no evidence that children's needs differed from other children). However, a child needs a safe and stable home. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs). And a child's basic needs include food, shelter, and clothing. *See In re K-A.B.M.*, 551 S.W.3d 275, 288 (Tex. App.—El Paso 2018, no pet.).

DFPS caseworker West testified that when the children entered DFPS's care, mother was living in a trailer home with "Frankie."[57] As to the condition of the trailer home, the HLPD incident report from August 16, 2021—the date the children were removed from mother's care—states that the law enforcement officers who

---

[57] "Frankie" is purportedly a cousin of E.J.C.'s father who has since moved away.

went to the trailer home noticed "a lot of garbage and shoes and many more random objects all over the front yard and porch area of the home." And "there was a very strong smell of ammonia" coming from the home. Further, Officer Bilbrey testified that at the trailer home, she and Frankie, who was living in the home and caring for E.J.C. on the night of August 16, 2021, could not find enough formula for E.J.C. and Frankie was unable to provide appropriate clothing for E.J.C.

Additionally, the HLPD incident report states that after law enforcement officers removed N.L.S. from mother's home, one of them went to get him food because he stated that he was hungry and had not eaten anything that day. And the Holiday Lakes resident, who contacted law enforcement officers about N.L.S., explained that he had been at her home "all day" for the four days prior to August 16, 2021 and he showed up each day hungry, wearing the same clothes, and barefoot.

DFPS caseworker West also testified that after the children were removed from mother's care, mother and E.J.C.'s father moved into a home together. After that, mother "went to jail," and once she was released, mother "mov[ed] from friend to friend." Then, mother began living with E.J.C.'s father and his mother. But, at the time of trial, mother was living in a one-bedroom apartment with E.J.C.'s father.

Mother similarly explained that during the pendency of the case, she had multiple different residences. After the children were removed from her care, mother continued living at the trailer home for about a month. Mother did not own

76

the trailer home but was renting it. Mother then moved into a friend's home until July 7, 2022. She did not have a lease while living at a friend's home, but she paid rent. Mother next moved to the Cranbrook Apartment complex. She had lived in two different apartments in that complex since July 7, 2022. Mother also noted that after she was released from jail, but before an apartment was available at the Cranbrook Apartment complex, she stayed with "two different friends."

As to her housing situation at the time of trial, mother explained that she lived in a one-bedroom apartment at the Cranbrook Apartment complex with E.J.C.'s father. According to mother, E.J.C.'s father went "back and forth between" her apartment and the apartment where his mother was living, which was in the same apartment complex. However, mother stated that because the mother of E.J.C.'s father was being evicted from her apartment, E.J.C.'s father would then stay with her. But she noted that E.J.C.'s father "said that if it was a problem [for] him being in [mother's home] due to the case," then "he would go elsewhere." According to mother, she had "no lease" for her apartment. And because E.J.C.'s father "d[id] the maintenance" for the apartment complex, mother did not have to pay rent for the apartment, but she is responsible for paying for electricity.[58] Mother claimed that

---

[58] Mother testified that at the time of trial she did not have a job. According to mother, she had previously worked at a cleaning service from February 2022 until January 2023. But West noted that mother had never given her any documentation to show that she was employed. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *30 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.)

she was not in a relationship with E.J.C.'s father at the time of trial, but she stated that he was not a danger to the children. Mother last saw E.J.C.'s father about two weeks before trial.

It is clear from the record that DFPS was concerned about mother's living arrangement with E.J.C.'s father because he had failed to complete, most, if not all, of the requirements of his FSP, he did not maintain a safe and stable home during the pendency of the case or submit to any narcotics-use testing, and he was arrested during the pendency of the case on "a theft charge." E.J.C.'s father also did not appear at trial even though his parental rights to E.J.C. were subject to termination. *See In re L.W.*, 2019 WL 1523124, at *13 ("A parent endangers her children by accepting the endangering conduct of other people."). Mother admitted that she did not have a support system if the children were returned to her care.

b. *Mother's Supervision*

Officer Bilbrey and Officer Newberry testified that on August 16, 2021, N.L.S. was found home alone around 5:20 p.m. Hours later, when law enforcement officers located mother, she reported to officers that N.L.S. was "out playing at a

---

(considering parent had difficulty maintaining stable employment in analyzing parental abilities and stability of proposed placement for children); *see also In re G.R.*, No. 07-16-00277-CV, 2016 WL 6242829, at *6 (Tex. App.—Amarillo Oct. 25, 2016, no pet.) (mem. op.) (noting parent unable to maintain steady employment or housing throughout termination case in considering stability of potential placement with parent).

friend's house," when he was actually at the HLPD station. Mother indicated to Bilbrey that she had not seen N.L.S. for "a few hours."

A HLPD incident report related to the events of August 16, 2021, a copy of which was admitted into evidence, lists mother as the "[s]uspect/[o]ffender" and the offense as abandoning or endangering a child.[59] The "[n]arrative[]" portion of the incident report states that Officer Newberry and Officer Bilbrey received a telephone call from a Holiday Lakes resident about a five-year old child, N.L.S., who had been at her home for the past few days. N.L.S. had been spending all day at her home with "no parent coming by to check on him." The resident reported that N.L.S. had arrived at her home each day dirty, hungry, with no shoes, and in the same clothes. On August 16, 2021, N.L.S. showed up at the resident's home at about 8:00 a.m., with a fish tank and some other belongings in his hands. He asked the resident if he could move in with her because "his mom [had] kicked him out of [h]is home." N.L.S., "with tears in his eyes," told the resident that he had been kicked out of his home "because he was trying to fill his fish tank up." When the resident had to leave her home later that day, she told N.L.S. that he needed to go home until she returned. But when she drove by N.L.S.'s home, she saw N.L.S. sitting on the front porch of his home holding his fish tank.

---

[59] *See* TEX. PENAL CODE ANN. § 22.041.

The incident report further states that when Officer Newberry and Officer Bilbrey went to N.L.S.'s home on August 16, 2021 around 5:20 p.m., the screen door was closed, but the main front door to the home was open. After Bilbrey knocked, N.L.S. came and opened the screen door for the officers and told them that mother was "not home right now." (Internal quotations omitted). After Bilbrey entered the home, she "looked in the rooms to confirm that no one was there," and N.L.S. kept repeating that "no one was [t]here." The law enforcement officers were not able to find anyone else in the home other than N.L.S. When Newberry located mother, several hours later, mother told Newberry that she had last seen N.L.S. that morning, but she was not sure of the exact time.

In the voluntary statement from the Holiday Lakes resident who contacted law enforcement officers about N.L.S., the resident states that N.L.S. was five-years old and had been at her home "all day" for the past four days. She was concerned about N.L.S. because he had been at her house "so often [and] for so long [and] . . . mother never came around." The resident had "never met" mother. On August 16, 2021, N.L.S. came to the resident's home at 8:00 a.m. and asked her "if he could live with [her] because . . . mother [had] kicked him out because he was filling up his fish tank."[60] N.L.S. "got teary eyed," and the resident let him into her house and fed him.

---

[60]     Mother, during her testimony, acknowledged that N.L.S. had a fish tank but stated that he did not have a fish in the tank. Further, according to mother, she sent N.L.S. down to the neighbor's home on the morning of August 16, 2021 so that he could

At about 2:00 p.m., the resident told N.L.S. "to go home," but he came back less than fifteen minutes later and said that mother had "kicked him out again." Later, when the resident had to leave her home, she asked N.L.S. if she could "drop[] him off at home" and he told her that "he was going to get a spanking from" mother. When the resident drove by N.L.S.'s home at about 5:00 p.m., she saw him sitting on the front porch. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(C) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrates adequate parenting skills, such as "supervision consistent with the child's safety"); *In re A.J.B.*, No. 10-18-00274-CV, 2018 WL 6684808, at *3 (Tex. App.—Waco Dec. 19, 2018, no pet.) (mem. op.) ("[Y]oung children are particularly vulnerable if left in the custody of a parent who is unable or unwilling to protect them or attend to their needs because they have no ability to protect themselves."); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.) (parent's inability to provide adequate care for child, lack of parenting skills, and poor judgment may be considered when looking at child's best interest); *In re C.M.W.*, No. 01-02-00474-CV, 2003 WL 579794, at *5 (Tex. App.—Houston [1st Dist.] Feb. 27, 2003, no pet.) (mem. op.) (children's basic needs include appropriate supervision).

---

get his shoes, which he had left there. Mother denied kicking N.L.S. out of the house.

c.      *Mother's Acts or Omissions*

A parent's failure to comply with her FSP supports a finding that termination of her parental rights is in the best interest of the children. *See In re J.S.B.*, 2017 WL 6520437, at \*22; *In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Here, in her briefing, mother does not dispute that she did not complete the requirements of her FSP. Further, DFPS caseworker West testified that mother did not complete substance-abuse counseling, did not complete individual therapy, and failed to submit to the required narcotics-use testing. Mother, during her testimony, acknowledged that she had received her FSP, but she did not complete the required substance-abuse counseling or individual therapy. And she failed to participate in all the required narcotics-use testing. *See In re E.S.S.*, No. 05-23-00031-CV, 2023 WL 4782682, at \*13 (Tex. App.—Dallas July 27, 2023, no pet. h.) (mem. op.) (parent's failure "to engage in the programs ordered in the [FSP] supports the trial court's best-interest finding"); *In re M.L.H.*, No. 04-21-00408-CV, 2022 WL 526501, at \*4 (Tex. App.—San Antonio Feb. 23, 2022, pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support trial court's best-interest finding where parent "engaged in her service plan, [but] failed to successfully complete it").

d.      *Current Placement*

82

DFPS caseworker West explained that the children were placed together in the same foster home, although it was not an adoptive home. The children were bonded to one another. Further, Sullivan, the guardian ad litem for the children, testified that E.J.C. was "very well settled-in" her foster parents' household. And because E.J.C. was young, "[t]he only people she[] [had] ever known in her life that ha[d] given her stability [were her] foster parents." She referred to her foster parents as "her parents."

Mother's FSP notes that N.L.S. was a healthy child, who was doing well in school. N.L.S. "fit[] in well with his foster family" and had a "positive relationship[] with his foster parents." It also states that E.J.C. was comfortable in her placement with her foster parents. Yet, it appears undisputed that the children's current placement is not an adoptive placement.

Sullivan did testify that "a family [had been] identified that [were] willing to adopt [the children]" and that family "want[ed] to be made the placement[] for [the children," but she did not provide much detail. She noted that a background check had been performed related to the family interested in adopting the children and the family had known the children for more than a year. Further, the potential adoptive placement would "have the [children's current foster] parents . . . close by, as they [were] all a tight-knit family."

83

To the extent that the evidence presented at trial indicates that the children's current placement with their foster parents is not a permanent placement, we note that "[a] lack of . . . definitive plans for [the] permanent placement and adoption" of the children at the time of trial is not dispositive of the best-interest analysis. *See In re C.H.*, 89 S.W.3d at 28; *see also In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of the children. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's parental rights was in the children's best interest, or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of the children. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in the best interest of the children. *See id.*

We overrule mother's second issue.

84

## C.    Managing Conservatorship

In her third issue, mother argues that the trial court erred in appointing DFPS as the children's sole managing conservator because there was a rebuttable presumption "that a parent w[ould] be named [the children's] managing conservator unless the [trial] court f[ound] that such [an] appointment would not be in the child[ren's] best interest" as it "would significantly impair the child[ren's] physical health or emotional development."  (Internal quotations omitted.)

The Texas Family Code provides that "[i]f the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, [DFPS], or a licensed child-placing agency as managing conservator of the child."  TEX. FAM. CODE ANN. § 161.207(a); *see also In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at *8 (Tex. App.—Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.) ("When the parents' parental rights have been terminated, [Texas] Family Code section 161.207 governs the appointment of a managing conservator.").  Generally, we review a trial court's conservatorship determination for an abuse of discretion.  *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

Importantly, an order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to her children.  TEX. FAM. CODE ANN. § 161.206(b); *In re A.L.J.*, No. 01-19-00251-CV, 2019 WL 4615826, at *9

85

(Tex. App.—Houston [1st Dist.] Sept. 24, 2019, no pet.) (mem. op.). A parent with no legal rights with respect to her children lacks standing to attack the portion of the trial court's order appointing DFPS as the sole managing conservator of the children. *See In re A.L.J.*, 2019 WL 4615826, at *9.

Here, we have overruled mother's complaint that the trial court erred in terminating her parental rights to the children. *See In re J.H.*, 2023 WL 2169952, at *27; *see also In re A.L.J.*, 2019 WL 4615826, at *9 ("Once we overrule a parent's challenge to the termination order, the trial court's appointment of [DFPS] as sole managing conservator may be considered a 'consequence of the termination' . . . ."); *In re S.R.*, 452 S.W.3d 351, 359 n.3 (Tex. App.—Houston [14th Dist.] Nov. 13, 2014, pet. denied) ("A trial court does not abuse its discretion in appointing [DFPS] as conservator of the children where the evidence is sufficient to support termination of parental rights."); *Quiroz v. Dep't of Fam. & Protective Servs.*, No. 01-08-00548-CV, 2009 WL 961935, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.) (refusing to address parent's complaint evidence insufficient to support DFPS's appointment as sole managing conservator where evidence sufficient to support termination of parent's rights). Thus, the trial court's order terminating mother's parental rights divested her of her legal rights and duties to the children. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re J.H.*, 2023 WL 2169952, at *27; *see also In re A.L.J.*, 2019 WL 4615826, at *9 ("Because we have

overruled [parent's] challenge to the portion of the trial court's order terminating her parental rights, the order has divested [her] of her legal rights and duties related to [the children].").

Having no legal rights with respect to the children, we hold that mother lacks standing to challenge the portion of the trial court's order appointing DFPS as sole managing conservator of the children. *See In re J.H.*, 2023 WL 2169952, at *27; *In re A.L.J.*, 2019 WL 4615826, at *9 ("[Parent] d[id] not have standing to challenge the portion of the order appointing [DFPS] as permanent managing conservator of the children because any alleged error could not injuriously affect her rights.").

We overrule mother's third issue.

## Termination of Father's Parental Rights

In his first issue, father argues that the trial court erred in terminating his parental rights to N.L.S. because the evidence is legally and factually insufficient to support the trial court's finding that father engaged, or knowingly placed N.L.S. with persons who engaged, in conduct that endangered his physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). In his second issue, father argues that the trial court erred in terminating his parental rights to N.L.S. because the evidence is legally and factually insufficient to support the trial court's finding that termination of father's parental rights was in the best interest of N.L.S. *See id.* § 161.001(b)(2).

As stated above, in order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Id.*; *Boyd*, 727 S.W.2d at 533. "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362.

In a portion of his first issue, father argues that the evidence is legally insufficient to support the trial court's finding that he engaged, or knowingly placed N.L.S. with persons who engaged, in conduct that endangered N.L.S.'s physical or emotional well-being because incarceration alone will not support the termination of parental rights and the evidence showed that father did not have "any knowledge of the reasons that [N.L.S.] w[as] removed/picked up by" DFPS, father believed that N.L.S was "in good health and in good hands with" mother, and "many of the convictions that were brought up at trial occurred years before [N.L.S.] was born and even before [father] knew that he was even the possible father of [N.L.S.]" *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

A trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child." *Id.* Within this context, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. Instead, "endanger" means to expose the child to loss or injury or to jeopardize their emotional or physical health. *Id.* (internal quotations omitted); *see also Walker*, 312 S.W.3d at 616.

We must look at a parent's conduct standing alone, including his actions and omissions. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). It is not necessary to establish that a parent intended to endanger the child. *See In re L.M.N.*, 2018 WL 5831672, at *14. But termination of parental rights under Texas Family Code section 161.001(b)(1)(E) requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d at 125; *see also In re L.M.N.*, 2018 WL 5831672, at *14. The specific danger to the child's well-being may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffers no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re L.M.N.*, 2018 WL 5831672, at *14; *In re R.W.*, 129 S.W.3d at 738. Courts may consider parental conduct that did

89

not occur in the child's presence, including conduct before the child's birth. *In re L.M.N.*, 2018 WL 5831672, at *14; *In re A.A.M.*, 464 S.W.3d at 426.

At trial, DFPS relied on father's history of incarceration to establish that father engaged, or knowingly placed N.L.S. with persons who engaged, in conduct that endangered N.L.S.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

Father testified that, at the time of trial, he was incarcerated, and he was incarcerated when N.L.S. was removed from mother's care in August 2021. According to father, in February 2021, he was convicted of the offenses of felon in possession of a firearm,[61] possession of a prohibited weapon,[62] evading arrest or detention,[63] assault of a family member,[64] and possession of a controlled substance,[65]

---

[61]    *See* TEX. PENAL CODE ANN. § 46.04.

[62]    *See id.* § 46.05.

[63]    *See id.* § 38.04.

[64]    *See id.* § 22.01. Mother was not the complainant of this offense.

[65]    The trial court admitted into evidence a copy of the indictment related to the possession-of-a-controlled-substance offense as well as a judgment of conviction showing that father pleaded guilty to the offense, and the trial court, in accord with the agreed punishment recommendation from the State, assessed father's punishment at confinement for 645 days. Father received a jail time credit of 631 days.

namely methamphetamine.[66] Father "signed . . . a five-year plea" bargain agreement related to those offenses. Father's discharge date is in May 2025.[67]

Father also noted that he was incarcerated when N.L.S. was born. As to his criminal history, father explained that in 2007, he was arrested for the offense of "theft of a firearm,"[68] and he pleaded guilty to the offense.[69] In 2009, he was convicted of the offense of assault[70] and received "time served in county jail."[71] Further, in 2013, he was convicted of the offenses of evading arrest or detention[72]

---

[66]    *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115. As to the possession-of-a-controlled-substance offense, father stated that his counsel at the time told him that there "was residue in a pipe" that was "in the back bed of [father's] truck." Notably, there is no evidence that N.L.S. was in father's care when he was in possession of a controlled substance or that father used narcotics in the presence of N.L.S.

[67]    Father stated that he had a parole hearing scheduled for March 2023, and he had "support letters . . . from the sheriff" because he was "a trustee" with the sheriff's department and worked as a welder.

[68]    *See* TEX. PENAL CODE ANN. § 31.03.

[69]    The trial court admitted into evidence a copy of the indictment related to the misdemeanor theft offense as well as a copy of a judgment, signed on December 5, 2008 and showing that father pleaded guilty to the misdemeanor offense of theft of a firearm and the trial court assessed father's punishment at confinement in the county jail for 100 days. Father received a jail time credit of 111 days.

[70]    *See id.* § 22.01. Father did not know mother at the time he was convicted of this offense, and mother was not the complainant of the offense.

[71]    The trial court admitted into evidence a copy of the information related to the misdemeanor assault offense and a copy of the judgment, stating that father pleaded guilty to the misdemeanor offense of assault and the trial court assessed his punishment at confinement for three days in the county jail. Father received a jail time credit of fourteen days.

[72]    *See id.* § 38.04.

and unauthorized use of a motor vehicle.[73]  And in 2014, father pleaded guilty to the

offense of burglary.[74]  In 2015, he pleaded guilty to the offense of "credit card

abuse."[75]

The fact that a parent is incarcerated, standing alone, does not constitute

engaging in conduct that endangers the emotional or physical well-being of a child,

although it may be a fact to consider on the issue of endangerment.  *See In re D.W.*,

Nos. 01-13-00880-CV, 01-13-00883-CV, 01-13-00884-CV, 2014 WL 1494290, at

*6 (Tex. App.—Houston [1st Dist.] Apr. 11, 2014, pet. denied) (mem. op.); *In re

M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.); *Walker v. Dep't

of Fam. & Protective Servs.*, 251 S.W.3d 563, 565 (Tex. App.—Houston [1st Dist.]

2006, no pet.); *see also In re J.F.-G.*, 627 S.W.3d 304, 316 (Tex. 2021) ("[M]ere

imprisonment—past    or    present—[does    not]    conclusively    constitute[]

endangerment . . . ." (internal quotations omitted)).  Instead, the State "must show

---

[73]    *See id.* § 31.07.

[74]    *See id.* § 30.02.  The trial court admitted into evidence a copy of the indictment related to the burglary offense and other documents admitted into evidence show that father, with an agreed punishment recommendation from the State, pleaded guilty to the offense of burglary of a building and the trial court deferred adjudication of father's guilt and placed him on community supervision for three years.  After the State filed a motion to adjudicate father's guilt, father pleaded true to certain allegations in the State's motion in exchange for the State recommending that punishment be assessed at confinement for eight months.  A copy of the judgment adjudicating guilt shows that the trial court assessed father's punishment at confinement for eight months and father received a "jail time credit" of 182 days.

[75]    *See id.* § 32.31.

that the incarceration [of the parent] is part of a course of conduct that is endangering the child[]." *In re D.W.*, 2014 WL 1494290, at *6 (internal quotations omitted). Importantly, termination of parental rights should not become an additional punishment for the commission of a criminal offense. *See In re A.E.G.*, No. 12-11-00307-CV, 2012 WL 4502085, at *4 (Tex. App.—Tyler Sept. 28, 2012, no pet.) (mem. op.) ("Imprisonment can be used only as a factor to consider on the issue of endangerment; otherwise, the termination of parental rights could become an additional punishment automatically imposed along with imprisonment for almost any crime."); *In re E.S.S.*, 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no pet.); *see also In re E.N.C.*, 384 S.W.3d at 805 (rejecting proposition that any offense committed by parent that could lead to imprisonment or confinement would establish endangerment to children).

Here, DFPS did not present clear and convincing evidence that N.L.S.'s physical or emotional well-being was endangered by father's criminal conduct or incarceration.[76] *See In re A.A.*, No. 06-14-00060-CV, 2014 WL 5421027, at *3 (Tex.

---

[76] DFPS asserts, in its briefing, that the facts of this case are the same facts as in our previous decision in *In re V.V.*, 349 S.W.3d 548 (Tex. App.—Houston [1st Dist.] 2010, no pet.) because the father in *In re V.V.* was incarcerated at the time of his child's birth, at the time the child entered DFPS's care, and at the time the trial court terminated the father's parental rights to the child. Although we held in *In re V.V.* that the evidence was legally sufficient to support "a termination finding based on endangerment," that case is factually distinguishable from the instant case. *See id.* at 553–57. Of note, in *In re V.V.*, the father, only days before trial, assaulted the child's mother, which was documented by photographic evidence. *See id.* 552–54. And the actions of both parents led to the child being in the care of DFPS since birth.

App.—Texarkana Oct. 23, 2014, no pet.) (mem. op.) (explaining "the relevant inquiry is whether evidence exists that the endangerment of the children's emotional or physical well-being was the direct result of [parent's] conduct"); *Ruiz v. Tex. Dep't of Fam. & Protective Servs.*, 212 S.W.3d 804, 818 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (DFPS must present evidence "that the endangerment of the child's physical or emotional well[-]being was the direct result of the parent's conduct"); *see also In re E.N.C.*, 384 S.W.3d at 803–05 (recognizing it was DFPS's burden to show "how the offense was part of a voluntary course of conduct" that endangered children and holding evidence legally insufficient to support termination under Texas Family Code section 161.001(b)(1)(E)); *In re L.C.L.*, 599 S.W.3d 79, 84 (Tex. App.—Houston [14th Dist.] 2020, no pet.) ("A plain language reading of the statute requires a causal connection between [parent's conduct] and the alleged endangerment.").

When N.L.S. was removed from mother's care, father was incarcerated, and there was no evidence presented at trial that N.L.S. entered DFPS's care because of father's acts or omissions.[77] *See Walker*, 251 S.W.3d at 565–66 (holding evidence

---

*See id.* at 553–54 (noting that "[a]n infant who is not looked after by either of her parents, as this one was not, undeniably is in serious danger of physical and emotional injury").

[77]  We note that father's FSP, which was created by DFPS, did not list any requirements for father to complete to ensure the return of N.L.S., other than to contact DFPS upon his release from confinement. For instance, it did not require father to participate in individual therapy, substance-abuse counseling, or parenting classes.

94

legally insufficient to support finding that parent engaged in conduct or knowingly placed children with persons who engaged in conduct that endangered their physical or emotional well-being where father was incarcerated at time children were removed from mother's care); *In re K.W.*, 138 S.W.3d 420, 431–32 (Tex. App.—Fort Worth 2004, pet. denied) (noting "[t]here must be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct" and holding evidence legally insufficient to support trial court's finding that parent engaged in conduct or knowingly placed child with persons who engaged in conduct that endangered child's physical or emotional well-being even though parent was incarcerated); *see also In re A.S.*, No. 09-21-00142-CV, 2021 WL 5113817, at *6 (Tex. App.—Beaumont Nov. 4, 2021, pet. denied) (mem. op.) ("Endangerment arises when a parent's conduct jeopardizes the child's emotional or physical health.").

Although father has been twice convicted of the offense of assault in the past, there was little detail as to those offenses introduced at trial—other than that they did not involve mother or N.L.S.—and DFPS did not introduce any evidence of a danger of violence to N.L.S. because of father's convictions. *See M.A.R. v. Dep't of Fam. & Protective Servs.*, No. 14-23-00094-CV, 2023 WL 5045687, at *7–8 (Tex. App.—Houston [14th Dist.] Aug. 8, 2023, no pet.) (mem. op.) (holding evidence legally insufficient to support trial court's finding that parent engaged in conduct or

knowingly placed child with persons who engaged in conduct that endangered child's physical or emotional well-being, although parent had criminal record and previous assault conviction); *see also In re E.N.C.*, 384 S.W.3d at 804–05 ("We agree that an offense occurring before a [parent's] children are born can be a relevant factor in establishing an endangering course of conduct, . . . but [DFPS] bears the burden of introducing evidence concerning the offense and establishing that the offense was part of a voluntary course of conduct that endangered the children's well-being."). The same can be said about father's conviction for the offense of possession of a controlled substance; DFPS did not introduce any evidence that N.L.S. was endangered by this criminal conduct by father.[78] *See M.A.R.*, 2023 WL 5045687, at *7–8 (holding evidence legally insufficient to support trial court's finding that parent engaged in conduct or knowingly placed child with persons who engaged in conduct that endangered child's physical or emotional well-being although parent tested positive for marijuana during pendency of case and had convictions for possession of marijuana in past because DFPS did not establish "[a] causal link between his usage of marijuana and any alleged endangerment"); *Ruiz*, 212 S.W.3d at 818 (holding evidence legally insufficient to support trial court's

---

[78] Additionally, to the extent that DFPS relies on criminal conduct committed by father in the distant past, DFPS did not show a present or future danger to N.L.S. because of those prior criminal convictions. *See Wetzel v. Wetzel*, 715 S.W.2d 387, 391 (Tex. App.—Dallas 1986, no writ).

finding parent engaged in conduct or knowingly placed child with persons who engaged in conduct which endangered the physical or emotional well-being of child where evidence of parent's narcotics use was limited and no evidence was presented showing parent used narcotics while caring for child or in child's presence); *In re D.J.J.*, 178 S.W.3d 424, 429–30 (Tex. App.—Fort Worth 2005, no pet.) (although parent was arrested and later imprisoned on "three drug possession charges," holding evidence legally insufficient to support trial court's finding that parent engaged in conduct or knowingly placed child with persons who engaged in conduct which endangered the physical or emotional well-being of child because "there [was] no evidence that [parent's] conduct in taking the methamphetamines that resulted in his arrest and imprisonment endangered [child's] physical or emotional well[-]being"); *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied) ("[T]here must be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct." (emphasis omitted)).

Here, DFPS did not establish by clear and convincing evidence a causal link between father's criminal conduct and any alleged endangerment to N.L.S. *See In re R.H.*, No. 01-14-00874-CV, 2015 WL 4594557, at *12 (Tex. App.—Houston [1st Dist.] July 28, 2015, no pet.) (mem. op.) ("The relevant inquiry is whether evidence exists that the parent's conduct—including acts, omissions, and failures to act—directly endangered the child's physical [or emotional] well-being."); *In re V.S.R.K.*,

97

No. 2-08-047-CV, 2009 WL 736751, at *7 (Tex. App.—Fort Worth Mar. 19, 2009, no pet.) (mem. op.) (although parent had two prior convictions for evading arrest and was incarcerated at time of trial, explaining DFPS had failed to show "how the endangerment was the 'direct result of' [parent's] conduct").

Additionally, there is no evidence that father knew that N.L.S. would be endangered while in the care of mother. Father testified that he and mother were only in a relationship in 2015 for a few months and they just "talked" from 2017 to 2019, but they never lived together during those times. When father first met mother, she lived with a friend in a "nice house" with four or five bedrooms. While mother and N.L.S. lived with father for a couple of months in 2018, mother was a good parent to N.L.S. She made N.L.S. dinner, gave him baths, and took him to doctors' appointments. Mother did not "lose track" of N.L.S. or fail to take care of him. She was attentive to his needs, and father did not see anything that would cause him to be concerned about mother's parental abilities. When mother and N.L.S. moved to another city, father did not have any concerns about mother parenting N.L.S. He did not think that she would be neglectful or endanger the child. Father did not know that mother had a history with DFPS when he let N.L.S. live with mother. After mother and N.L.S. decided to move, father went to visit N.L.S. on weekends. Mother's new home was clean. According to father, he did not know that mother used narcotics and he and mother never used narcotics together. *See Walker*, 251

S.W.3d at 566 (holding evidence legally insufficient to support trial court's finding that parent engaged in conduct or knowingly placed child with persons who engaged in conduct that endangered child's physical or emotional well-being where evidence only showed parent was incarcerated and other parent's actions led to child's removal); *In re K.W.*, 138 S.W.3d at 431–32 (holding evidence legally insufficient to support trial court's finding that parent engaged in conduct or knowingly placed child with persons who engaged in conduct that endangered child's physical or emotional well-being where incarcerated parent did not know of other parent's narcotics use or about abuse occurring in other parent's home).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could not have formed a firm belief or conviction that father engaged, or knowingly placed N.L.S. with persons who engaged, in conduct that endangered N.L.S.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *see also Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex. 1985) (courts are required to strictly construe involuntary termination statutes in favor of parent).

Accordingly, we hold that the evidence is legally insufficient to support the trial court's finding that father engaged, or knowingly placed N.L.S. with persons

who engaged, in conduct that endangered N.L.S.'s physical or emotional well-being.[79]  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

We sustain a portion of father's first issue.[80]

## Conclusion

We affirm the portion of the trial court's order terminating the parental rights of mother.  We reverse the portion of the trial court's order terminating the parental rights of father, and we render judgment denying the petition for termination of father's parental rights to N.L.S.  Because father did not challenge the portion of the trial court's order naming DFPS the sole managing conservator of N.L.S., we affirm that portion of the trial court's order.

---

[79]  DFPS must support its allegations against a parent by clear and convincing evidence; a preponderance of evidence or conjecture is not enough.  *See In re E.N.C.*, 384 S.W.3d 796, 809–10 (Tex. 2012) ("Due process commands that courts apply the clear and convincing evidentiary standard in parental rights termination cases."); *In re T.S.*, No. 01-22-00054-CV, 2022 WL 4474277, at *28 (Tex. App.—Houston [1st Dist.] Sept. 27, 2022, no pet.) (mem. op.).  Given the weighty constitutional interests of the parent involved in a termination-of-parental-rights proceeding, the interests of the child involved, and the effect that the placement of the child will have on numerous lives, it is imperative, and consistent with the high evidentiary standard of proof applicable to these cases, that DFPS fully develop the evidence at trial.  *See In re T.S.*, 2022 WL 4474277, at *28.  Only then can the appellate record be commensurate with the magnitude and finality of a termination decision.  *See id.*; *see also In re B.D.A.*, 546 S.W.3d 346, 393 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Massengale, J., dissenting on rehearing) ("The law sets a high evidentiary bar for termination of parental rights.  We do not alleviate the plight of Texas . . . children by lowering that bar and perpetuating diminished judicial expectations of the proof that must be presented by [DFPS].").

[80]  Due to our disposition, we need not address the remaining portion of father's first issue or father's second issue.  *See* TEX. R. APP. P. 47.1.

Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.